BOLIN, Justice.
This appeal arises from a dispute between the Alabama Commercial Mobile Radio Services (“CMRS”) Board (“the CMRS Board”) and the individual members of the CMRS Board, on the one hand, and T-Mobile South, LLC, and PowerTel Memphis, Inc. (hereinafter referred to collectively as “T-Mobile”), two providers of wireless telephone services, regarding emergency “911” service charges for purchasers of prepaid wireless service, on the other.

Legislative History

Traditionally, emergency 911 service provided callers with direct access to a public-safety answering point, which is responsible for dispatching emergency services, including police, fire, and medical assistance. Enhanced 911 or “E911” provides the operator with the caller’s telephone number and/or location and enables the operator to direct the call to the nearest answering point. Originally, emergency 911 telephone services were tied to wired telephone exchanges at homes and businesses, and local 911 services were funded by service charges assessed to those “land lines.” In 1984, Alabama adopted the Emergency Telephone Service Act, § 11-98-1 et seq., Ala.Code 1975 (“the Act”), to authorize local governing bodies to create communications districts for the purpose of establishing local emergency telephone service and to provide funding for such service.
*968 With the advent of cellular technology, cellular telephones and other wireless devices became important means of communications, and in 1998 the legislature amended the Act to include such devices. The 1998 amendment created the CMRS Board and provided, among other things, that the CMRS Board would levy and administer an emergency-telephone-service charge on certain wireless connections in Alabama. § 11-98-7, Ala.Code 1975 (1998 amendment).[1] The Act provided that the CMRS Board would receive the revenues from the service charge and deposit those revenues in the CMRS Fund,[2] to be disbursed to all 911 call centers in Alabama. The 1998 amendment to the Act imposed the service charge “on each CMRS connection that has a principal wireless service address (or billing address, if the principal wireless service address is not known) within the state.” § ll-98-7(b)(l), Ala.Code 1975 (1998 amendment). The 1998 amendment defined a “CMRS connection” as “each number assigned to a CMRS customer.” § 11-98-6(5), Ala.Code 1975 (1998 amendment). The 1998 amendment provided that “[e]ach CMRS provider shall act as a collection agent for the CMRS Fund and shall, as part of the provider’s normal monthly billing process, collect the CMRS service charges” levied pursuant to § 11-98-7(b)(l) from each CMRS connection to which the billing provider provided CMRS service. § ll-98-8(a), Ala.Code 1975 (1998 amendment). The provider, not later than 60 days after the end of the calendar month in which the charges are collected, is to remit to the CMRS Board the charges collected less an amount, not to exceed one percent of the gross aggregate amount, for the costs of collecting, handling, and processing the service charge. § ll-98-8(a) and (b). The CMRS provider is not liable for any service charge not paid by the customer.
Pursuant to § ll-98-7(b)(7), the CMRS Board has the authority to promulgate rules necessary to effect the provisions of the Act. In 1999, the CMRS Board adopted an administrative rule levying a CMRS emergency-telephone-service charge on “each CMRS connection that has a principal wireless address (or billing address if the principal wireless service address is no[t] known) within the state, including prepaid connections.” Ala. Admin. Code (CMRS Board), r. 225-1-3-.01 (emphasis added). In 2005, the legislature amended the Act to, among other things, include voice over Internet protocol (“VoIP”) in § 11-98-5.1 as subject to the service charge.[3]
In 2007, the legislature again amended the Act. The 2007 amendment changed the language in § 11 — 98—7(b)(1), Ala.Code 1975, to provide that the service charge was to be imposed “on each CMRS connection that has a place of primary use within the geographical boundaries of the State of Alabama.” (Emphasis added.) The 2007 amendment defined a CMRS connection as “[a] mobile telephone number assigned to a CMRS customer.” § 11-98-6(5), Ala. Code 1975. The 2007 amendment to the Act defined “place of primary use” as *969 “[t]he street address representative of where the customer’s use of the mobile telecommunications service primarily occur, which must be: a. The residential street address or the primary business street address of the customer; and b. within the licensed service area of the CMRS provider.” § 11-98-6(17), Ala. Code 1975. The 2007 amendment established a commission to study and to make recommendations to enhance the delivery of emergency 911 services, including “[t]he process by which all providers of telephone services, including wired and wireless providers and prepaid and post-paid providers, collect and remit 911 charges.... ” § 11 — 98—7.2(b)(6) (repealed effective June 1, 2008). The 2007 amendment deleted that language in § ll-98-8(a) that required the CMRS provider to collect CMRS charges “as part of the provider’s normal monthly billing process” and substituted “CMRS provider” for “billing provider” in the first sentence. The 2007 amendment also added subsections (g) and (h) to § 11-98-8; subsection (g) provides the CMRS Board with a remedy when a provider fails to remit collected service charges.

Facts and Procedural History

T-Mobile South, LLC, and PowerTel Memphis, Inc., are owned by T-Mobile USA, Inc., and provide wireless service to customers in Alabama. T-Mobile provides both “prepaid” and “postpaid” wireless services. Postpaid customers are those customers who pay for services (typically measured in minutes) they used the previous month and who are sent a monthly bill by their provider. T-Mobile does not send monthly bills to prepaid customers because prepaid customers pay in full for their ■wireless minutes at the point of sale. Prepaid customers may purchase telephones or other devices and minutes (for previously purchased devices) either directly from T-Mobile at a T-Mobile USA store, T-Mobile USA’s Web site, or an authorized dealer (e.g., discount retail stores such as Wal-Mart and Target). Prepaid customers can activate their devices at a T-Mobile USA store, on T-Mobile USA’s Web site, or by calling an automated telephone line. During the activation process, T-Mobile requires each prepaid customer to select an area code. Service for prepaid customers’ connections (represented by telephone numbers) is available for 90 days (or 365 days if the customer purchases a $100 refill card) following activation. The Federal Communications Commission requires that a cellular telephone or device be able to connect with emergency 911 services, even if there are no minutes left on the device or in the account. This requirement applies to both prepaid and postpaid customers. Although T-Mobile does not send monthly bills to its prepaid customers, T-Mobile charges prepaid customers for “411” directory-information calls and deducts a certain amount from the prepaid customer’s account when 411 calls are made, both for placing the call and for the minutes spent on the call.
From May 2003 through May 2005, T-Mobile paid the 911 service charge on behalf of its prepaid CMRS connections. T-Mobile used a monthly report of customers with an account balance of $1 or more and then looked at the prepaid wireless customers with telephone numbers with an Alabama area code. That number was multiplied by the $.70 charge set out in the Act, and the resulting amount was remitted to the CMRS Board.
In June 2005, T-Mobile ceased paying the 911 service charge for its prepaid connections. In July 2007, T-Mobile resumed paying the service charge on behalf of its prepaid customers. It is undisputed that T-Mobile has never collected the service charge from any of its prepaid customers.
*970 On December 20, 2006, T-Mobile requested a refund of CMRS service charges it had paid the CMRS Board from May 2008 through May 2005. On March 7, 2007, the CMRS Board denied the request. On February 8, 2008, T-Mobile filed a declaratory-judgment action against the CMRS Board and the members of the CMRS Board, individually and in their official capacities (both the CMRS Board and its members are hereinafter collectively referred to as “the Board”),[4] seeking a judgment: declaring that the service charge does not apply to prepaid wireless service; declaring that application of the service charge to prepaid wireless service would violate the uniformity requirement in the Act and would constitute an invalid increase in the service charge under the Act; declaring that application of the service charge to prepaid wireless service would violate the Commerce Clause of the United States Constitution; and declaring that the Board acted on mistaken interpretations of law in applying the service charge to prepaid wireless service and exceeded its statutory authority in requiring and collecting the service charge from T-Mobile on prepaid connections. T-Mobile also sought an injunction prohibiting the CMRS Board from demanding or collecting the service charge on behalf of prepaid-wireless-service customers; requiring the CMRS Board to place moneys from the CMRS Fund into an escrow account to secure reimbursement of the amounts incorrectly paid by T-Mobile; and directing the CMRS Board to refund to T-Mobile $1,167,388.36 plus applicable interest in service charges paid on behalf of prepaid connections. T-Mobile also sought an award of attorney fees, costs, and expenses.
On April 3, 2008, the Board filed a motion to dismiss, which the trial court subsequently denied. The Board filed an answer and a counterclaim seeking a judgment declaring that the service charge applies to prepaid wireless connections and that T-Mobile is required to collect and then to remit the service charge, or to pay it directly, to the CMRS Board. The Board sought an injunction preventing T-Mobile from failing to remit or to pay the service charge for prepaid wireless connections; restitution of unpaid service charges; and the imposition of a constructive trust upon service charges already collected by T-Mobile. The Board asserted that, since 2007, T-Mobile has negligently or wantonly underpaid the service charges for prepaid wireless connections and breached its fiduciary duty to the CMRS Board in so doing.
Because the material facts were not in dispute, both sides filed summary-judgment motions. On April 2, 2010, the trial court entered an order denying T-Mobile’s summary-judgment motion and granting the Board’s motion. The trial court stated, in pertinent part:
“Based upon the plain language of the Act, the Court finds that the Act applies to prepaid wireless customers. To hold otherwise would lead to the ‘absurd’ result that one group of beneficiaries of the Act are not required to fund it while another group of beneficiaries is so burdened. See, Ex parte Meeks, 682 So.2d 423, 428 (Ala.1996). The specific purpose of the Act is to fund the enhanced emergency 911 system for all wireless telephone customers, whether or not their service is prepaid. There is no dispute that [T-Mobile is a] CMRS pro *971 vider[] under the Act, which defines a ‘CMRS Connection’ as either: (a) ‘Each number assigned to a CMRS customer’ (1998 version), or (b) ‘A mobile telephone number assigned to a CMRS customer’ (2007 amendment), § 11-98-6. The Act makes no distinction in the definition of a customer, whether prepaid or billed.
[[Image here]]
“[T-Mobile]’s claim that the imposition of the Charge[5] as to their prepaid wireless customers violates the Commerce Clause of the United States Constitution also fails. The Charge is based upon activity that has a substantial nexus to the State of Alabama in that the customers to whom this charge applies have a primary use in the state. [T-Mobile] has the capacity to ascertain the place of primary use of [its] prepaid wireless customers, and [its] intentional failure to obtain this information cannot relieve [it] of [its] obligation to determine those addresses. One does not excuse the failure to exercise a fiduciary obligation by willfully failing to act. Only if [T-Mobile] obtain[s] information from the customer which places their primary use outside Alabama would [its] obligation under the Act be relieved.
“The Act meets the other requirements of Constitutionality. The Charge is fairly apportioned because it applies across the board to the beneficiaries of the services which the Charge funds. By limiting its application to customers with a primary use address in Alabama, the Act does not discriminate against interstate commerce and fairly relates to the benefits provided the customer.
[[Image here]]
“[The Board is] entitled to a permanent injunction. [It has] succeeded on the merits of [its] declaratory judgment action. The threat of irreparable, repetitive harm is clear. Since [T-Mobile is] required to collect and remit the Charge monthly, should [it] fail to do so, the [Board] would be forced to bring suit in the Circuit Court of Montgomery County periodically to enforce collection. See, City of Prichard v. Cooper, 358 So.2d 440, 441 (Ala.1978). [T-Mobile] has shown no harm caused by [its] having to collect and/or remit the Charge. Finally, an injunction is in the public interest in this case in order to assure that 911 and enhanced 911 services are adequately funded.
“The Court finds that [T-Mobile] ha[s] willfully breached [its] statutory duty to collect the Charge from 2005 to 2007. However, [the Board] cannot claim damages for this entire period as it goes beyond the two year statute of limitations for tort claims, and the Charge does not qualify as a tax under the provisions which would allow a five year statute of limitations to apply. [The Board’s] claims for underpayment during the 2003-2005 period are also outside the statute of limitations.
“The Court further finds that [T-Mobile] ha[s] a fiduciary responsibility to collect and/or remit the Charge to [the CMRS Board]. The statute specifically makes [T-Mobile an] ‘agent[]’ of the CMRS Board for the collection and remission of the Charge. § ll-98-8(a). Thus, the statute creates the agency relationship. Such a relationship is fiduciary in nature. Because the amounts claimed as damages include periods beyond the two-year statute of limitations, the Court will require the [CMRS Board] to submit new calculations which do not represent claims arising before February 8, 2006, two years before this *972 action was filed. [The Board] also elaims underpayment of the Charge since [T-Mobile] resumed paying. In 2007, [T-Mobile] ha[s] used a method of estimating the amount owed based upon an ‘average revenue per user’ (ARPU) methodology. This ARPU method, while approved in at least one other state, is not approved in Alabama. In addition, [the Board] argue[s] persuasively that the method seriously understates the amount of the Charge due to be remitted. Upon review, the Court finds that use of the ARPU method to calculate the amount of the Charge to be remitted violates the Act. Therefore, [the Board is] entitled to a recovery of this underpayment as damages.
“[The Board] also claim[s] that [T-Mobile] [is] not entitled to deduct one percent from the amount properly included in the Charge because [it] ha[s] not collected from customers. The Act reads:
“ ‘Each CMRS provider shall be entitled to deduct and retain from the service charges collected by the provider during each calendar month an amount not to exceed one percent of the gross aggregate amount of the CMRS service charges collected as reimbursement for the costs incurred by the provider in collecting, handling and processing the CMRS service charges.’
“ll-98-8(b).
“In order to qualify for the deduction, there must first be an amount collected from which the deduction can be taken. If the Charge is remitted without collecting it from customers, there is no amount from which the deduction can be taken. Because [T-Mobile] ha[s] chosen to remit the Charge without first collecting it, [it is] not entitled to the one percent deduction.”
The trial court reserved final judgment pending further consideration of the calculation of damages. Subsequently, the trial court entered a final judgment awarding damages, and T-Mobile timely appealed.

Analysis

The primary issues in this appeal involve the construction of a statute. This Court has stated:
“ ‘ “[I]t is this Court’s responsibility in a case involving statutory construction to give effect to the legislature’s intent in enacting a statute when that intent is manifested in the wording of the statute....
‘ “ ‘ “[I]f the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.” ”” ... In determining the
intent of the legislature, we must examine the statute as a whole and, if possible, give effect to each section.”
“ ‘Ex parte Exxon Mobil Corp., 926 So.2d 303, 309 (Ala.2005). Further,
“ ‘ “when determining legislative intent from the language used in a statute, a court may explain the language, but it may not detract from or add to the statute.... When the language is clear, there is no room for judicial construction.... ”
“ ‘Water Works & Sewer Bd. of Selma v. Randolph, 833 So.2d 604, 607 (Ala. 2002).’
“Ex parte Birmingham Bd. of Educ., 45 So.3d 764, 767 (Ala.2009).”
Archer v. Estate of Archer, 45 So.3d 1259, 1263 (Ala.2010).
Similarly, in Lambert v. Wilcox County Commission, 623 So.2d 727, 729 (Ala.1993), the Court stated:
*973 “ ‘The fundamental rule of statutory construction is that this Court is to ascertain and effectuate the legislative intent as expressed in the statute.... In this ascertainment, we must look to the entire Act instead of isolated phrases or clauses ... and words are given their plain and usual meaning. ... Moreover, just as statutes dealing with the same subject are in pari materia and should be construed together, ... parts of the same statute are in pari materia and each part is entitled to equal weight.’ ”
(Quoting Darks Dairy, Inc. v. Alabama Dairy Comm’n, 367 So.2d 1378, 1380-81 (Ala.1979).)
With regard to the 1998 amendment to the Act, T-Mobile argues that the amendment in effect during the period for which the trial court concluded that T-Mobile had willfully breached its statutory duty to collect the service charge — 2005 to 2007— imposed the charge only on CMRS connections (i.e., telephone numbers) in Alabama that had a principal wireless service address or billing address only if the principal wireless service address is not known.[6] Because T-Mobile contends that prepaid customers have neither a principal wireless service address nor a billing address, T-Mobile argues that, by the plain language of the 1998 amendment, the Act does not impose a duty to collect the service charge from its prepaid wireless customers. T-Mobile argues that the 1998 amendment makes it clear that the service charge could be collected “as part of the provider’s normal monthly billing process” and, therefore, does not apply to prepaid wireless service. See § ll-98-8(a) and (b) (1998 amendment).
The 1998 amendment to the Act provided in pertinent part, as follows:
Section ll-98-7(b)(l) gave the CMRS Board the power:
“(1) To levy a CMRS emergency telephone service charge on each CMRS connection that has a principal wireless service address (or billing address, if the principal wireless service address is not known) within the state. The rate of such CMRS service charge shall be seventy cents ($.70) per month per CMRS connection beginning on May 1, 1998, which amount shall not be increased except by the Legislature. The CMRS service charge shall have uniform application and shall be imposed throughout the state. The board is authorized to receive all revenues derived from the CMRS service charge levied on CMRS connections in the state and collected pursuant to Section 11-98-8.”
Section 11-98-8 set out the duties of the CMRS providers such as T-Mobile and provided:
“(a) Each CMRS provider shall act as a collection agent for the CMRS Fund and shall, as part of the provider’s normal monthly billing process, collect the CMRS service charges levied upon CMRS connections pursuant to Section 11 — 98—7(b)(l) from each CMRS connec *974 tion to whom the billing provider provides CMRS service and shall, not later than 60 days after the end of the calendar month in which such CMRS service charges are collected, remit to the [CMRS] board the net CMRS service charges collected after deducting the fee authorized by subsection (b). Each billing provider shall list the CMRS service charge as a separate entry on each bill which includes a CMRS service charge.
“(b) Each CMRS provider shall be entitled to deduct and retain from the CMRS service collected by the provider during each calendar month an amount not to exceed one percent of the gross aggregate amount of the CMRS service charges collected as reimbursement for the costs incurred by the provider in collecting, handling, and processing the CMRS service charges.
“(c) The [CMRS] board shall be entitled to retain from the CMRS service charges collected during each calendar month an amount not to exceed two percent of the gross aggregate amount of such CMRS service charges collected as reimbursement for the costs incurred by the board in administering this chapter, including, but not limited to, retaining and paying the independent, third party auditor to review and disburse the cost recovery funds and to prepare the reports contemplated by this chapter.
“(d) The CMRS provider shall have no obligation to take any legal action to enforce the collection of the CMRS service charge. If a CMRS provider receives partial payment for a monthly bill from a CMRS subscriber, the CMRS provider shall apply the payment against the amount the CMRS subscriber owes the CMRS provider first, and shall remit to the board the lesser amount, if any, as shall result therefrom.
“(e) The charges and fees collected under this section shall not be subject to taxes or charges levied on or by the CMRS provider, nor shall the charges and fees be considered revenue of the CMRS provider for any purposes. The CMRS provider shall annually provide to the emergency communications district management review board an accounting of the amounts billed and collected and of the dispositions of the amounts.
“(f) State and local taxes do not apply to the CMRS service charge.”
The purpose of the 1998 amendment was to provide for an enhanced emergency 911 system for wireless telephone customers. Section ll-98-7(b) provides that the service charge shall have uniform application and shall be imposed throughout the state.
T-Mobile contends that prepaid wireless customers do not have a “principal wireless service address” because of the nature of prepaid service, which “allows” customers to sign up for service without disclosing any address information. T-Mobile contends that it does not have billing addresses for those customers because it does not bill its prepaid wireless customers. T-Mobile contends that the 1998 amendment to the Act does not trigger the duty to obtain address information from prepaid wireless customers. T-Mobile contends that, as a factual matter, although it may have address information for some of its prepaid customers, that information is not kept up to date and would be difficult to keep accurate. T-Mobile notes that prepaid wireless service is inherently portable; no monthly bill is generated for customers of that service. We recognize that T-Mobile would not have a billing address for all of its prepaid customers; however, we disagree with T-Mobile’s contention that the 1998 amendment to the Act does not apply to prepaid *975 customers because prepaid customers are allowed to activate their service without giving their principal wireless service address. T-Mobile’s argument that the 1998 amendment to the Act did not trigger a duty to collect the service charge from prepaid wireless customers is based on its assertion that prepaid-wireless-service providers “allow” consumers to activate their service without disclosing the principal address where the wireless service would be used. That argument, however, does not reflect the words used in the Act but, instead, reflects T-Mobile’s business choice not to ask the prepaid customer for the principal address where the prepaid wireless service would be used.[7]
The 1998 amendment did not define “principal wireless service address.” It is well settled that words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and a principal wireless service address would be the address (home or business) where the wireless customer receives most of his or her wireless service. The legislature recognized that a wireless customer’s billing address may be different from his or her principal wireless service address when it allowed the CMRS Board to charge the service charge on a “CMRS connection that has a principal wireless service address (or billing address, if the principal wireless service address is not known) within the state.” § ll-98-7(b)(l) (1998 amendment). That is, under § 11-98-7(b) as it read following the 1998 amendment, a monthly bill is not a requirement for imposition of the service charge because the CMRS Board has the power to levy an emergency 911 service charge on each CMRS connection with a principal wireless service address in Alabama, and if the principal wireless service address where most of the wireless calls would be placed is not known, then the CMRS Board may levy the 911 service charge on a customer with a billing address in Alabama. The 1998 amendment to the Act provided, in pertinent part, that the service charge was to be levied on a principal wireless service address in Alabama, and T-Mobile’s decision not to ask for the principal wireless service address of its prepaid customers was a business decision, not an exclusion of prepaid customers based on the language in the 1998 amendment to the Act.
However, the 1998 amendment to the Act does not end with requiring T-Mobile merely to collect the service charge, because § 11-98-8 went on to set out the duties of the CMRS provider in collecting the service charge. T-Mobile argues that § 11-98-8 as it was amended in 1998 shows an intent by the legislature to exclude prepaid-wireless-service subscribers from paying the emergency 911 service charge because T-Mobile has never sent bills to or had any “normal monthly billing process” for its prepaid wireless *976 customers, and, therefore, it cannot list the service charge as a separate entry on a bill as then required by the Act. T-Mobile contends that by its plain language §11-98-8 simply does not apply to prepaid wireless customers.
In 1998, § ll-98-8(a) provided:
“Each CMRS provider shall act as a collection agent for the CMRS Fund and shall, as part of the provider’s normal monthly billing process, collect the CMRS service charges levied upon CMRS connections pursuant to Section 11 — 98—7(b)(1) from each CMRS connection to whom the billing provider provides CMRS service and shall, not later than 60 days after the end of the calendar month in which such CMRS service charges are collected, remit to the [CMRS] board the net CMRS service charges collected after deducting the fee authorized by subsection (b) hereof. Each billing provider shall list the CMRS service charge as a separate entry on each bill which includes a CMRS service charge.”
(Emphasis added.) In § ll-98-8(a), the legislature used the terms “CMRS provider” and “billing provider.” In the 1998 amendment to § 11-98-6, the legislature defined “Commercial Mobile Radio Service or CMRS” to include wireless service. See § 11-98-6(3) (1998 amendment). The legislature has defined a “CMRS Provider” as “[a] person or entity who provides commercial mobile radio service or CMRS service.” See § 11-98-6(4) (1998 amendment and 2007 amendment). The definition of CMRS provider does not include any reference to the method of payment by the CMRS subscriber. Although the legislature did not define “billing provider,” we construe those words, using their common, ordinary meaning, to mean the person or entity that provides a CMRS subscriber with the subscriber’s bill.
T-Mobile is clearly a “CMRS provider” under the Act — it is an entity that provides CMRS service. § 11-98-6(4). T-Mobile does not dispute this point. Under § 11— 98-8(a), the CMRS provider acts as a “collection agent for the CMRS fund....” Section 11 — 98—8(a), as it read before the 2007 amendment, went on to provide that, “as part of the provider’s normal monthly billing process, [the provider shall] collect the CMRS service charges levied upon CMRS connections pursuant to Section 11 — 98—7(b)(1) from each CMRS connection to whom the billing provider provides CMRS service.... ” We disagree with T-Mobile that the second sentence in § 11-98-8(a) requiring each billing provider to list the service charge as a separate entry on its bill excludes T-Mobile from its duty to collect the service charge from its prepaid customers. A “CMRS provider” may also be a “billing provider,” and, if it is, then the service charge should be reflected separately on the customer’s bill. However, the legislature did create an ambiguity in § ll-98-8(a) in 1998 when it used both the term “CMRS provider” and the term “billing provider” in the first sentence of § ll-98-8(a).
In determining whether judicial construction of a statute is required, we must read together the provisions of the entire statute under review and determine if there is any ambiguity based on the entire statute. Darks Dairy, Inc. v. Alabama Dairy Comm’n, supra. The overriding factor in interpreting an ambiguous term in a statute is legislative intent. Ex parte Holladay, 466 So.2d 956 (Ala.1985). In § 11 — 98—7(b)(1), as it read following the 1998 amendment and as it now reads, the legislature states that the CMRS service charge shall have uniform application and shall be imposed throughout the state. The legislature defined a CMRS provider without any reference to the method of *977 payment to the CMRS provider by the CMRS subscriber. § 11-98-6. In § 11-98-7(b)(l) (1998 amendment), the legislature recognized that a monthly bill is not a requirement for imposing the 911 service charge. It would lead to an absurd result to conclude that the legislature intended, by adopting the 1998 amendment to the Act, to exclude an entire group of wireless service providers from acting as collection agents based on their billing relationship with their customers. Whether a CMRS customer is billed prospectively (prepaid) or retrospectively (postpaid), each CMRS customer has access to emergency 911 services by making a telephone call on his or her cellular device. If T-Mobile is not required to collect the service charge from its prepaid customers, then its prepaid customers would be being treated differently from its postpaid customers. T-Mobile’s argument that the legislature intended to exclude prepaid customers from the payment of the service charge also defies a common-sense reading of the Act, and such an exclusion would defeat the purpose of the Act. It is undisputed that emergency 911 service is available for T-Mobile’s prepaid customers even if they do not have any minutes left on their account, just as it is available to postpaid customers who are delinquent in paying their monthly bills. We note that T-Mobile’s warranty documents provided to its prepaid customers includes a disclaimer regarding service availability of emergency 911 calls, which is an acknowledgment by T-Mobile that its prepaid customers have access to emergency 911 service. For T-Mobile to argue that the legislature intended to exclude prepaid customers from paying the service charge for emergency 911 service and then to disclaim liability for the availability of such service seems disingenuous.
In 1999, a year after the 1998 amendment, the CMRS Board promulgated a rule specifying that “[t]he CMRS Board shall levy a CMRS emergency telephone charge on each CMRS connection that has principal wireless address (or billing address if the principal wireless service address is no[t] known) within the state, including prepaid connections.” Ala. Admin. Code (CMRS Board), r. 225-1-3-.01 (emphasis added). It is well settled that this Court should “ ‘ “ ‘give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with enforcement of the statute.’ ” ’ ” QCC, Inc. v. Hall, 757 So.2d 1115, 1119 (Ala.2000) (quoting NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995), quoting other cases). Although it may be that most of the CMRS providers in 1998 were providing wireless service and billing their customers retroactively, it appears from the adoption of the regulation in 1999 that prepaid wireless service was available then, and the CMRS Board’s interpretation of the 1998 amendment to the Act to expressly include prepaid connections was a reasonable construction of the 1998 amendment.
In 2002, the CMRS Board asked for an opinion from the attorney general as to whether the service charge was applicable to prepaid wireless connections. The attorney general stated, in pertinent part:
“There is no question that a billing address is the address where the wireless carrier sends a monthly bill. A prepaid customer, however, does not receive a monthly bill, and so we must determine if a prepaid cellular customer has a primary service address and the location of that address. A CMRS connection is defined as ‘[e]ach number assigned to a CMRS customer.’ Ala.Code § 11-98-6(5) (Supp.2001). The emergency service charge is applicable to *978 each wireless telephone number that the wireless carrier assigns to a customer. Section 225.1.3 of the Alabama Administrative Code further provides that ‘the CMRS board shall levy a CMRS emergency telephone charge on each CMRS connection that has a principal wireless service address (or billing address if the principal wireless service address is not known) within the state, including prepaid connections.’ Ala. Admin. Code § 225.1.3 (2001). The Alabama statute does not define ‘principal wireless service address’ per se.
“All of the wireless carriers in Alabama require, at the least, a name and address of the prepaid customer. Even if there is no bill sent to the address provided at purchase, that address should serve as the principal wireless service address for purposes of levying this service charge. The Mobile Telecommunications Sourcing Act, 4 U.S.C. §§ 106-252 (2000) defines ‘primary place of use’ as the applicable residential or business street address supplied to the home service provider’s customer. See 4 U.S.C. § 122 (2000). Under section 122 of this act, a home service provider shall be responsible for obtaining and maintaining the customer’s primary place of use. Id. This section mandates that wireless carriers obtain and maintain a residential or business street address for each wireless customer. This address is classified as the place of primary use in the federal regulation. It is the opinion of this Office that the primary place of use and the principal wireless service address have the same definition. The intent of the Legislature was to levy the same emergency service charge on prepaid phone customers as on billable customers. The Alabama Administrative Code supports this interpretation by specifically including ‘prepaid’ in its definition of connections with principal service addresses. See Ala. Admin. Code § 225.1.3(2001).”
Op. Att’y Gen. No. 2002-295 (July 26, 2002). T-Mobile argues that this Court should not rely on this attorney general’s opinion because, it argues, the opinion is flawed in that the attorney general incorrectly determined the Mobile Telecommunications Sourcing Act, 4 U.S.C. § 116 et seq. (“the MTSA”), mandated that prepaid wireless providers obtain and maintain physical addresses for their customers.[8] Although we agree with T-Mobile that the MTSA does not require prepaid wireless providers to obtain and maintain their customers’ addresses, it appears that all wireless providers (of prepaid and postpaid service) required an address from their customers in 2002. We note that T-Mobile was not providing wireless service to customers in Alabama in 2002 and that its predecessors remitted the service charge to the CMRS Board during that period. We agree with the attorney general’s conclusions that the CMRS Board had properly interpreted the Act by including “prepaid” customers in its regulation and that the legislature intended to levy the same emergency service charge on prepaid phone customers as on customers who were sent regular bills. An attorney general’s opinion is not binding upon this Court, although it can be persuasive authority. Anderson v. Fayette Cnty. Bd. of Edna, 738 So.2d 854, 858 (Ala.1999).
The legislature’s 2007 amendment to the Act indicates an intent to clarity any ambiguity created by the 1998 amendment. In its 2007 amendment to § ll-98-7(b)(l), *979 the legislature omitted the phrase “principal wireless service address (or billing address, if the principal wireless service address is not known) within the state” and replaced it with the phrase “place of primary use within the geographical boundaries of the State of Alabama.” The 2007 amendment imposes the charge on each CMRS connection that has a place of primary use in Alabama. In the 2007 amendment, the legislature defined the “place of primary use” as “[t]he street address representative of where the customer’s use of the mobile telecommunications service primarily occur, which must be: a. The residential street address or the primary business street address of the customer; and b. within the licensed service area of the CMRS provider.” § 11-98-6(17). The legislature also amended § ll-98-8(a) in 2007 to omit the phrase “as part of the provider’s normal monthly billing process”; the legislature also omitted “billing provider” in the same sentence and replaced it with “CMRS provider.” This clarifies any ambiguity in the 1998 amendment with regard to T-Mobile’s acting as a collection agent for the service charge. As noted above, the 2007 amendment also includes a definition for “place of primary use,” whereas the 1998 amendment did not include a definition for “principal wireless service address.” “When statutes are amended or replaced by succeeding legislation, the Legislature often seeks to clarify previously ambiguous provisions. These subsequent acts by the Legislature must be considered in trying to determine the intent of the legislation. 78 Am. Jur.2d, Statutes, § 178.” McWhorter v. State Bd. of Registration for Prof'l Eng’rs & Land Surveyors, 359 So.2d 769, 773 (Ala.1978). Additionally, the 2007 amendment created a long-range study commission to examine “[t]he process by which all providers of telephone services, including wired and wireless providers and prepaid and post-paid providers, collect and remit 911 charges in this state and in other states.” § 11-98-7.2(6) (repealed effective June 1, 2008).
We also find persuasive Commonwealth of Kentucky Commercial Mobile Radio Service Emergency Telecommunications Board v. TracFone Wireless, Inc., 735 F.Supp.2d 713 (W.D.Ky.2010). In TracFone, an earlier version of a Kentucky statute authorized its CMRS board to collect a 911 service charge on each CMRS connection (defined as a telephone number) within the Commonwealth of Kentucky. The statute also provided, in pertinent part:
“Each CMRS provider shall act as a collection agent for the CMRS fund and shall, as part of the provider’s normal monthly billing process, collect the CMRS service charges levied upon CMRS connections under KRS 65.7629(3) from each CMRS connection to whom the billing provider provides CMRS. Each billing provider shall list the CMRS service charge as a separate entry on each bill which includes a CMRS service charge. If a CMRS provider receives a partial payment for a monthly bill from a CMRS customer, the provider shall first apply the payment against the amount the CMRS customer owes the CMRS provider.”
735 F.Supp.2d at 717.
TracFone had argued that it was not a CMRS provider because the Kentucky statute did not use the term “prepaid” and because the wireless provider did not bill its prepaid customers monthly. The federal court noted that these reasons did not remove TracFone from the clearly broad scope of the definition of CMRS provider under the statute. The court held that the fact that the term “prepaid” was not used in the statute was irrelevant because the statute defined CMRS provider without *980 reference to any method of payment or business model. The court concluded that the statute was clearly written in broad terms to encompass all forms of cellular-telephone providers. TracFone also had argued that it did not have to collect or remit the 911 fee because it did not provide monthly bills to its prepaid customers. The court stated:
“[T]he CMRS provider merely acts as a ‘collection agent’ that collects ‘service charges levied upon CMRS connections under KRS 65.7629(3).’ KRS § 65.7635(1). For TracFone to be obligated to collect the fees, then, its customers must first be obligated to pay them. No doubt they are. The service charge applies to ‘each CMRS connection within the Commonwealth.’ KRS § 65.7629(3). A ‘CMRS connection’ is defined as ‘a mobile handset telephone number assigned to a CMRS customer.’ KRS § 65.7621(6). ‘ “CMRS customer” means a person to whom a mobile handset telephone number is assigned and to whom CMRS is provided in return for compensation.’ KRS § 65.7621(7). Each TracFone customer receives a ‘mobile handset telephone number’ and cell phone service from TracFone. Therefore, they are ‘CMRS customers.’ KRS § 65.7629(3) levies the service charge on ‘each CMRS customer within the Commonwealth’ regardless of their method of purchasing such service.
“The statute clearly states that ‘[e]ach CMRS provider shall act as a collection agent for the CMRS fund....’ KRS § 65.7635(1). Therefore, in light of the definitions examined, the statute, at its most basic level and in no uncertain terms, requires TracFone to collect the service fees from its Kentucky customers. This is the same conclusion that Judge Conliffe reached in [Commonwealth of Kentucky v.] Virgin Mobile[, U.S.A., L.P., No. 08-CI-10857 (Jefferson Circuit Court, March 25, 2010) ]. As Judge Conliffe stated ‘it is clear that the Defendant is mandated to collect the fee in question from its customers. Any other interpretation would contravene the uniformity requirement of K.R.S. 65.7627.’ This is a most reasonable analysis under the circumstances.
“The 1998 Act, however, does not end with this clear provision requiring TracFone to collect the service fees. Rather, it goes on to prescribe a specific method of collection:
“ ‘Each CMRS provider ... shall, as part of the provider’s normal monthly billing process, collect the CMRS service charges levied upon CMRS connections under KRS 65.7629(3) from each CMRS connection to whom the billing provider provides CMRS. Each billing provider shall list the CMRS service charge as a separate entry on each bill which includes a CMRS service charge.’
“KRS § 65.7635(1) (emphasis added). Without doubt, this statutory method of collection does not comport with TracFone’s chosen business model. TracFone does not send its customers any ‘bills,’ much less utilize a ‘normal monthly billing process.’ Without a bill, there is no document on which TracFone would logically ‘list the CMRS service charge as a separate entry.’ According to TracFone, reference to this explicit collection method must mean that the statute applies only to postpaid cell phone providers who utilize traditional billing systems and not to prepaid providers.”
735 F.Supp.2d at 721-23 (footnotes omitted).
We note that there was no disagreement among the parties in TracFone that the Kentucky statute should be analyzed as a *981 tax statute. The federal district court went on to hold that the clear intent and language of the statute required each CMRS provider to collect the service fee from each customer to whom it provided service. “To interpret the statute to apply only to post-paid providers would, indeed, create an exemption for prepaid providers. Because such an exemption is not clearly required by the statute’s plain language, the Court cannot grant one.” 735 F.Supp.2d at 723. The federal district court also noted that, “[i]f prepaid providers are not required to collect the fee, they would gain a competitive advantage over their postpaid rivals. Such an interpretation would violate” the uniformity provision of the statute. 735 F.Supp.2d at 726.
We conclude that the 1998 amendment to the Act did not exclude prepaid customers from the emergency 911 service charge. We agree with the trial court that it would lead to an absurd result to conclude that although both prepaid and postpaid wireless customers have equal access to emergency 911 services, only postpaid wireless customers must pay the service charge to fund the emergency 911 system. We recognize that other states have expressly included “prepaid” customers in their emergency 911 service-charge statutes. However, the legislature’s decision not to expressly refer to prepaid customers (or postpaid customers for that matter) bolsters the conclusion that the legislature’s broad definitions of “CMRS” and “CMRS provider,” along with its imposition of the emergency 911 service charge in the 1998 amendment on CMRS connections with a “principal wireless service address” or “billing address” in Alabama, evidence an intent that those who have access to the service pay for the service, regardless of the method by which they are charged or billed.
With regard to the 2007 amendment, T-Mobile argues that the use of the phrase and the definition of “place of primary use” comes from the MTSA, which expressly excludes prepaid wireless service from coverage under the MTSA. T-Mobile argues that the use of this phrase and the exemption of prepaid services from the MTSA demonstrate an inherent conflict between prepaid services and the phrase “place of primary use.”
Congress enacted the MTSA, which became effective in August 2002, as a way to simplify the taxation of wireless telecommunications services by creating uniform methods of “sourcing,” which is the process of determining where a transaction is taxable. In the MTSA, Congress attached a “source” for wireless calls to a single geographical jurisdiction for taxing purposes. 4 U.S.C. §§ 116-126. The MTSA provides rules for state and local governments to follow in determining how to tax mobile telecommunications services in their jurisdiction. Under the MTSA, wireless telecommunications services are “sourced” to the customer’s “place of primary use,” 4 U.S.C. § 122, which is defined as the customer’s residential or primary business address, which must be located in the service provider’s licensed service area. 4 U.S.C. § 122. The taxing jurisdiction in which the “place of primary use” is located is the only jurisdiction that may tax the mobile call, regardless of the customer’s location when the call originates, terminates, or is in progress. 4 U.S.C. § 122. The MTSA does not apply to the taxing situs of prepaid-wireless-telephone services because the device is considered tangible personal property and is taxed accordingly. T-Mobile’s argument is unavailing because the legislature incorporated into the Act only the MTSA definition of “place of primary use” and did not incorporate other provisions of the *982 MTSA for the obvious reason that the MTSA is tax-sourcing legislation and not intended to fund emergency 911 service.
T-Mobile argues that “place of primary use” as defined in the 2007 amendment to the Act — the street residence where the customer’s use of the mobile telecommunications service primarily occurs — does not apply to prepaid customers because it wrongly assumes that a prepaid customer purchased the device for his or her own use in Alabama. The “place of primary use” as defined in the 2007 amendment is tied to the street address where the wireless customer’s use of the wireless service occurs. It is similar to the 1998 amendment, which also tied a wireless customer’s use to the customer’s principal wireless service address. T-Mobile’s argument that tying a wireless device to the street address where the customer primarily uses the device evinces an intent by the legislature not to include prepaid customers because a customer might purchase a prepaid telephone for another’s use at another address is not convincing. Whether one pays up front for minutes or pays after the telephone calls are made, i.e., the billing relationship, has nothing to do with whether one purchases a wireless telephone for another’s use. Certainly, plenty of parents purchase telephones for their children’s use while in college and many pay for that service retroactively (postpaid). Instead, T-Mobile made a business decision not to ask its prepaid customers for the relevant address information so that it can ensure that the service charge is imposed on customers within Alabama. T-Mobile’s business choice does not relieve it from its duty to collect the service charge under the Act.
T-Mobile argues that the 911 service charge is a tax and not a true service charge and that, because it is a tax, any ambiguity in the 1998 or 2007 amendment should be construed in favor of the taxpayers, i.e., the CMRS customers. In Lightwave Technologies, LLC v. Escambia County, 804 So.2d 176 (Ala.2001), this Court addressed the issue whether a charge assessed a telecommunications company that wanted to install a fiber-optic cable along a public right-of-way by a county was a fee or a tax:
“The evidence before this Court indicates that the purpose behind the imposition of the per-linear-foot charge was not to ‘regulate’ the use of the County’s rights-of-way; rather, the charge was not a ‘fee,’ but was in reality an impermissible tax. First, the charge was designed to generate revenue for the County; this fact was established by the deposition testimony of two County Commissioners, who stated that they voted to impose and collect the charge because they felt the County was entitled to receive compensation for allowing Lightwave to use the public rights-of-way. Second, the amount of the fee is not rationally related to the expected cost of repairing the rights-of-way after the fiber-optic cable has been installed. We agree with the federal court that the ‘lack of correlation between the expected cost to the county and the magnitude of the fee militates in favor of a finding that the right-of-way fee is a revenue-raising “tax under State law.” ’ Lightwave Techs., L.L.C. v. Escambia County, 43 F.Supp.2d [1811] 1314 [ (S.DAla. 1999)]. Third, the moneys received through the imposition of the charge were deposited into the County’s Gasoline Tax Fund. This fund held tax moneys collected for maintenance of the County’s roads and bridges — not for maintenance of the County’s rights-of-way.”
804 So.2d at 180.
“‘A tax is generally a revenue raising measure, imposed by a legislative body, *983 that allocates revenue to a general fund, and is spent for the benefit of the entire community. A user fee, by contrast, is a payment given in return for a government provided benefit and is tied in some fashion to the payor’s use of the service.’ ”
Lightwave Techs., L.L.C. v. Escambia County, 43 F.Supp.2d 1311, 1314 (S.D.Ala. 1999) (quoting Folio v. City of Clarksburg, 134 F.3d 1211 (4th Cir.1998) (internal quotation marks and citations omitted)).
In St. Clair County Home Builders Ass’n v. City of Pell City, 61 So.3d 992 (Ala.2010), the city adopted an ordinance imposing a fee on builders of new homes to make necessary improvements to municipal sewer and water systems and to defray the costs of providing extra services to the new homes. The trial court concluded that the fees collected under the ordinance were to be used solely for capital improvements to the city’s water and sewer systems, that the fees were incident to the provision of a particular service, and that the fees did not constitute a general revenue tax. This Court stated:
“Under Alabama law, fees charged by a municipality to defray the costs of providing its residents a specific service are generally considered service fees, as opposed to ‘taxes,’ which are imposed to generate general revenue for a municipality. In Martin v. City of Trussville, 376 So.2d 1089 (Ala.Civ.App.1979), a municipality adopted an ordinance ‘providing for the collection and disposal of garbage and the assessment of fees for providing such service.’ 376 So.2d at 1091. A landowner challenged the ordinance arguing, among other things, that ‘the ordinance is a taxation ordinance exceeding the powers of taxation granted to a municipal corporation.’ 376 So.2d at 1092. In holding that the fees imposed by the ordinance constituted a service fee, which a municipality has the power to impose independent of its powers of taxation, which must be expressly granted, the Court of Civil Appeals held, in pertinent part:
“‘As to the issue of whether the municipal corporation exceeded its taxation authority, we note 71 Am. Jur.2d State and Local Taxation § 11 (1973) recognizes that all revenue received by a city is not “accurately” characterized as a tax.... Oral testimony reveals the ordinance was passed to defray the costs of garbage collection. The charge involved is actually a fee for a service provided by the city which had previously been provided at no cost to its citizens. Consequently, we will consider the garbage charge in this case a “service charge” rather than a tax.’
“376 So.2d at 1092.
“Ten years after Martin was decided, this Court further clarified the distinction between a fee and an unlawful tax in Town of Eclectic v. Mays, 547 So.2d 96 (Ala.1989). In Mays, as in Martin, the issue was whether a municipal ordinance instituting a mandatory garbage-collection fee constituted an illegal tax. In analyzing the issue, the trial court found the following facts significant:
“‘At all times relevant to this proceeding, the monies collected from the garbage service have been paid into the general fund of the Town of Eclectic. At no time have these garbage service monies been separated or segregated into any separate account.
[[Image here]]
“‘... No money raised by the garbage service has been set aside for replacing capital equipment used in providing the garbage service. Any serious discussion concerning replace *984 ment of capital equipment began after the filing of this lawsuit.’
“547 So.2d at 100. The trial court then held that ‘ “[t]he Town of Eclectic’s garbage service fees have been and are being used to provide general revenue for the town. Consequently, the garbage service fees are in reality a form of tax.”’ 547 So.2d at 101. This Court affirmed the trial court’s judgment and held that the fees imposed by the ordinance constituted an unlawful tax, basing its decision on evidence indicating that ‘the garbage service fees were used to provide general revenue for the town and that revenues from the garbage service fees were spent in municipal departments other than the garbage department.’ 547 So.2d at 103.
“Martin and Mays stand for the proposition that a fee imposed by a municipality is considered a service fee when the municipality charges a fee that is related to defraying the costs of a specific service and the moneys collected from the imposition of that fee are earmarked for that specific service and are not used as general revenue for the municipality. This principle is further illustrated in Lightwave Technologies, LLC v. Escambia County, 804 So.2d 176 (Ala.2001), upon which the home builders rely. In Lightwave, Escambia County charged a telecommunications company a $1.00 per-linear-foot charge for each foot of a right-of-way it used in installing some 17 miles of fiber-optic cable along the county’s highway right-of-way. The charge purportedly related to regulation of Es-cambia County’s rights-of-way. However, this Court held that the charge Vas not a “fee,” but was in reality an impermissible tax.’ 804 So.2d at 180. This Court held that because ‘the charge was designed to generate revenue for the County’ and the moneys collected pursuant to the charge were spent on other governmental purposes and ‘not for maintenance of the County’s rights-of-way,’ the charge was an impermissible tax rather than a fee. 804 So.2d at 180.
“In this case, it is undisputed that the ordinance limits the use of the impact fees and the capital-recovery fees collected to capital improvements to its water and sewer systems; the fees are not considered general revenue to be used for any purpose. The evidence reveals that the City plans on using the fees imposed by the ordinance to defray the costs of providing water and sewer services to its residents. Further, it is undisputed that the fees are deposited in separate accounts specifically earmarked for capital improvements to the water and sewer systems. Therefore, the impact fees and the capital-recovery fees are properly characterized as service fees rather than taxes.”
61 So.3d at 1002-04.
In the present case, the service charge is based on providing telephone service, whether it be through a landline connection or a wireless connection, and the money from the service charge is used to fund the emergency 911 service provided via that connection. The money collected from the service charge does not provide general revenue that can be used for any purpose. Section 11-98-7 sets out the disbursements of the 911 service charge, which are used to defray the costs of implementing and operating the emergency 911 system. In Madison County Communications District v. BellSouth Telecommunications, Inc., Civil Action 06-S-1786-NE (N.D.Ala. decided, April 15, 2009) (unpublished memorandum opinion), the federal district court addressed whether the defendant had properly assessed its service users the service charge set out in the Act. Among other things, the court addressed whether the service charge was a *985 tax or fee, holding that “[b]ecause the E911 charge is based on provision of telephone service, and is used to fund a specific service (911 service), the charge is not a revenue-raising measure and, therefore, not a tax.” We agree.
T-Mobile next argues that the service charge violates the Commerce Clause of the United States Constitution.[9] T-Mobile relies on Goldberg v. Sweet, 488 U.S. 252, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989), in which the United State Supreme Court discussed the method for analyzing whether state taxing statutes were externally consistent. Even if we assume that the service charge is a tax, which we have concluded it is not, we do not agree that the service charge violates the Commerce Clause. In Goldberg, the Supreme Court analyzed an excise tax on gross charges of interstate telephone calls originating or terminating in Illinois and charged to an Illinois service address, regardless of where the telephone call was billed or paid.[10] The excise tax was also imposed on intrastate calls. The service provider challenged the tax as violative of the Commerce Clause, arguing that the tax violated the four-part test set out in Complete Auto Transit, Inc. v. Brady, 480 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).
The Goldberg Court distinguished “cases [dealing] with the movement of large physical objects over identifiable routes, where it was practicable to keep track of the distance actually traveled within the taxing State,” 488 U.S. at 264, and telephone service, where “the path taken by the electronic signals is often indirect and typically bears no relation to state boundaries.” 488 U.S. at 255. The decision confirmed that even a state or local taxing authority may impose a transaction-privilege tax on the interstate activities of a telecommunications provider without violating federal law if the imposition of the tax satisfies a four-part test. 488 U.S. at 257. The four parts of the test are: (1) the taxpayer has a substantial nexus with the city or state; (2) the tax is fairly apportioned; (3) the tax does not discriminate against interstate commerce, and (4) the tax is fairly related to the taxpayer’s activities and presence in the city or state. 488 U.S. at 257.
T-Mobile argues that the service charge is not fairly apportioned because, it argues, the “tax” lacks the external consistency required by Goldberg. “The external consistency test asks whether the State has taxed only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed.” Goldberg, 488 U.S. at 262. Specifically, T-Mobile contends that customers who purchase prepaid services in Alabama may use some or all that service outside the state. The basis for this argument is that T-Mobile contends that it cannot gather any reliable data regarding where its prepaid customers are located, in contrast to postpaid customers, who must give their billing address. This argument relates to T-Mobile’s business decision not to ask its prepaid customers for their primary place of use when they activate their devices or when they add *986 minutes to their existing prepaid account. The Act provides that the emergency 911 service charge applies to wireless connections with “a place of primary use within the geographical boundaries of the State of Alabama.” § ll-98-7(b)(l). The place of primary use is the street or business address where the customer’s use of the service primarily occurs. § 11-98-6(17). In other words, the CMRS provider collects the service charge only on connections with a substantial relationship to an Alabama address.
T-Mobile also argues that the service charge violates the Commerce Clause because the Act does not provide for a credit for similar “taxes” paid in other states. Specifically, T-Mobile contends that in contrast to postpaid customers, who sign up and receive a bill at their address, prepaid customers may purchase and use their wireless devices anywhere “without being tied to any address.” (T-Mobile’s brief, at p. 60.) T-Mobile argues that “[s]uch a credit is necessary to avoid the risk of multiple taxation that would arise when, for example, an Alabama resident purchases a prepaid phone while on a trip to Texas, requests an Alabama area code for that phone, and then uses minutes on that phone in each state while driving back to Alabama.” (T-Mobile’s brief, at p. 61.) T-Mobile’s argument is based on its business choice to ask prepaid customers for an area code rather than complying with the terms of the Act and requesting information from the customer regarding the “place of primary use.” Again, T-Mobile’s business choice does not relieve it of its duty to comply with the terms of the Act. Moreover, the United States Supreme Court in Goldberg did not create a requirement that a tax contain a tax-credit provision in order to be fairly apportioned because the limited possibility of multiple taxation was not sufficient to invalidate the entire statutory scheme. The Supreme Court has also stated that “[t]he Constitution does not ‘invalidat[e] an apportionment formula whenever it may result in taxation of some income that did not have its source in the taxing State.’ ” Container Corp. of America v. Franchise Tax Bd., 463 U.S. 159, 169-70, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) (quoting Moorman Mfg., Co. v. Bair, 437 U.S. 267, 272, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978)).
Last, T-Mobile argues that the trial court erred in determining that the average revenue per user (“ARPU”) method, which T-Mobile began using in July 2007 to estimate the service charge owed, violates the Act. T-Mobile does not collect the service charge from its prepaid customers but, instead, pays the service charge on their behalf. Under the ARPU method, the prepaid provider takes all of its prepaid revenue from a state and divides it by $50 — the average paid by a prepaid customer each month — in order to estimate the number of prepaid customers for purposes of paying the emergency 911 service charge. T-Mobile contends that because neither the Act nor the CMRS Board have provided for a specific method for it to pay the service charges owed by its customers, T-Mobile is free to choose a method. That method, however, must comply with the terms of Act. Section 11-98 — 7(b)(1) provides that a 911 service charge is levied upon “each CMRS connection that has a place of primary use within the geographical boundaries of the State of Alabama. The rate of the CMRS service charge shall be seventy cents ($.70) per month per CMRS customer on each CMRS connection.... ” Section 11-98-8(a) provides that each CMRS provider “shall collect the CMRS service charges levied upon CMRS connections pursuant to Section 11 — 98—7(b)(1) from each CMRS connection to whom the CMRS provider *987 provides CMRS service.... ” T-Mobile’s use of the ARPU method ties the amount it pays on behalf of its CMRS customers to a figure it contends is the average amount a prepaid customer spends on wireless service each month. This does not comply with the Act because the service charge is a monthly charge unrelated to the amount a customer spends that month. In addressing this same argument by a prepaid wireless provider in Washington where that state imposed a 911 excise tax on all telephone numbers assigned to or used by a subscriber, that court stated:
“[TracFone’s argument] misapprehends what is being taxed.... If a subscriber has a cellular telephone number assigned to the subscriber or used by the subscriber, the tax must be paid. The tax is not imposed on the sale of airtime minutes nor is the tax based upon the number or rate of minutes purchased or used in a month....
[[Image here]]
“... TracFone’s arguments, which are focused on numbers of minutes purchased and the rate at which they are used, do not reflect the statute’s taxation of telephone numbers for the months that they are active.
“... Uniformity, as with the tax itself, is ... concerned with access lines, not with how many minutes are used or the rate at which they are used....
“As thus defined, uniformity is not the insurmountable problem that TracFone claims.”
TracFone Wireless, Inc. v. Washington Department of Revenue, 170 Wash.2d 273, 286, 242 P.3d 810, 817-18 (2010). Furthermore, T-Mobile uses $50 as its ARPU when the testimony in the record indicates that the ARPU for a prepaid customer is between $16 and $20 per month, which would indicate that under the ARPU method T-Mobile is underpaying the service charge on its customers’ behalf.

Conclusion

Under both the 1998 and the 2007 amendments to the Act, the service charge is imposed on the CMRS connection, which was defined both in 1998 and in 2007 as the telephone number assigned to a CMRS customer. Clearly, the monthly service charge is based upon the telephone connection. Nothing in the record indicates that prepaid wireless connections differ in access to emergency 911 services from postpaid wireless connections. Instead, the difference between a prepaid customer and a postpaid customer is the method of payment. In the 1998 amendment and the 2007 amendment, the legislature’s intent was to impose the service charge on all CMRS connections, including those provided by T-Mobile to its customers who prepay. The record does not show that T-Mobile is unable to collect the service charge from its prepaid customers. In fact, from 2003 to 2005, T-Mobile collected the monthly service charge from every prepaid connection with an Alabama area code that had $1 in their account, and T-Mobile currently charges its prepaid wireless customers for “411” directory assistance calls by debiting their accounts. T-Mobile’s business decision not to ask its prepaid wireless customers for their “principal wireless service address,” the term used in the 1998 amendment, or their “place of primary use,” the term used in the 2007 amendment, is just that, a business decision. It does not excuse T-Mobile from complying with the Act.[11] Ac *988 cordingly, the judgment of the trial court is affirmed.
AFFIRMED.
MALONE, C.J.,* and WOODALL, STUART, PARKER, MURDOCK, SHAW,* MAIN, and WISE, JJ., concur.

.The Act was amended again in 2007, and the 2007 amendment modified some of the same provisions modified by the 1998 amendment. Because both amendments are discussed in the opinion, we have indicated parenthetically when we are referring specifically to language added by the 1998 amendment, which has now been superseded by the 2007 amendment.

. The "CMRS Fund” is "[t]he Commercial Mobile Radio Service Fund required to be established and maintained pursuant to § 11-98-7(b)(2).”

. VoIP is a technology that allows telephone calls using a broadband Internet connection.

. Those members are Leslie Bonet, Bill Brod-eur, Johnny Hart, Tommy Sherer, Bobby Singleton, Ron Sleeper, and Roger Wilson.

. Earlier in its order the trial court defined "charge” as "the CMRS service charge."

. T-Mobile originally sought a refund from the service charges it paid on behalf of its customers from 2003 to 2005. T-Mobile did not collect the service charge or pay the charge on its prepaid customers’ behalf from June 2005 to June 2007. T-Mobile agreed in its summary-judgment motion with the Board that the two-year statute of limitations for torts was applicable. The trial court concluded that the two-year statute of limitations was applicable and that claims arising out of T-Mobile's failure to collect the service charge before February 8, 2006, two years before T-Mobile filed its action, were not actionable. From July 2007, T-Mobile has remitted the service charge under the "average revenue per user” method on behalf of its prepaid customers. The 2007 amendment became effective on June 14, 2007.

. As noted earlier, prepaid customers purchase a cellular telephone or other device and minutes, and they pay for the device and minutes at the point of sale. However, to activate the device or card, customers must contact T-Mobile through a customer-care representative, in a retail store, or through the Internet. T-Mobile acknowledges that in very limited circumstances it does collect information detailing some form of an address that may be associated with a particular prepaid wireless account but that it does not collect this information for billing purposes and does not verify the information. T-Mobile does ask all prepaid customers for an area code and the city nearest them. T-Mobile advises the prepaid customer to select the area code nearest them so as not to incur long-distance fees for local calls. The information T-Mobile chooses to obtain from its prepaid customers represents a geographical tie to the wireless customer, and a customer can change his or her area code as necessary.

. The MTSA expressly excludes prepaid wireless services from the MTSA. We discuss the import of the MTSA later in this opinion.

. The Commerce Clause provides that "Congress shall have the power ... to regulate commerce ... among the several States.” U.S. Const., Art. I, § 8, cl. 3. "Even where Congress has not acted affirmatively to protect interstate commerce, the Clause prevents States from discriminating against that corn-merce.” D.H. Holmes Co. v. McNamara, 486 U.S. 24, 29, 108 S.Ct. 1619, 100 L.Ed.2d 21 (1988).

. The difficulties in applying Goldberg to mobile telecommunications led Congress to adopt the MTSA.

. Similar arguments regarding business choices by prepaid wireless providers have failed in other courts. See Commission on State Emergency Commc'ns v. TracFone Wireless, Inc., 343 S.W.3d 233, 240 (Tex.App. 2011) ("While [the prepaid providers’] chosen *988 business model may make it more difficult for them to assess and collect the fee, such a difficulty does not itself evince a legislative intent to exclude the telecommunications connections they provide from the reach of section 711.0711.”); TracFone Wireless, Inc. v. Nebraska Public Serv. Comm’n, 279 Neb. 426, 435, 778 N.W.2d 452, 459 (2010) (‘‘[The prepaid wireless provider’s] choice of business model does not give it license to throw up its hands and pay nothing.”); TracFone Wireless, Inc., 170 Wash.2d at 289, 242 P.3d at 818 ("We do not agree ... that the manner in which a clearly taxable event (an assigned cell phone number) is marketed can negate a tax that is otherwise clearly payable.”).