VIRGIN MOBILE U.S.A.,
L.P, Appellant

v.

COMMONWEALTH of Kentucky on Behalf of COMMERCIAL MOBILE RADIO SERVICE Telecommunications Board, Appellee

and

Commonwealth of Kentucky on Behalf of Commercial Mobile Radio Service Telecommunications Board, Appellant

v.

Virgin Mobile U.S.A., L.P, Appellee.

Nos. 2012–SC–000621–DG,
2012–SC–000626–DG.

Supreme Court of Kentucky.

Aug. 21, 2014.

As Modified on Denial of Rehearing
Dec. 18, 2014.

Douglas Frank Brent, Timothy Joseph Eifler, Mark Terrell Hurst, Charles W. Schwartz, Counsel for Virgin Mobile U.S.A., L.P.

Jonathan Goldberg, Jan Michele West, Jennifer Kaelin Luhrs, Counsel for Commonwealth of Kentucky on Behalf of Commercial Mobile Radio Service Telecommunications Board.

John Kenneth Bush, Mark Allen Loyd Jr., Counsel for Amicus Curiae–CTIA–The Wireless Association.

Opinion of the Court by Justice VENTERS.

Appellant/Cross–Appellee, Virgin Mobile USA (Virgin), appeals from an opinion of the Court of Appeals that affirmed a summary judgment entered in the Jefferson

Circuit Court. The circuit court had concluded that Virgin was indebted to the Appellee/Cross–Appellant, Commercial Mobile Radio Emergency Service Telecommunications Board (CMRS Board, or the Board) in the sum of $547,945.67 in commercial mobile radio service (CMRS) charges that Virgin was required to collect and remit to the CMRS Board. Virgin had claimed that it owed nothing to the Board. The Jefferson Circuit Court also awarded attorneys' fees to the Board, but the Court of Appeals reversed that award. The CMRS Board cross-appeals from that portion of the Court of Appeals' opinion.

The essential facts are not in dispute. Upon our review, we conclude that Virgin is indebted to the CMRS Board in the sum of $286,807.20, not $547,945.67, and therefore, we affirm in part and reverse in part. With respect to the attorneys' fee issue, we reverse the Court of Appeals and remand the case to the Jefferson Circuit Court for consideration of that issue in light of this opinion.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

For many years the General Assembly has provided a mechanism for taxing telephone service to provide funding for the state's system of 911–emergency service. In 1984, the legislature authorized local governments to impose a special tax upon telephone service to finance local 911–emergency systems. See KRS 65.760. Of course, at that time virtually all telephone communications were conducted through wires strung between poles, and the 911–emergency service systems were designed accordingly. They were not compatible with the new technologies for wireless cellular telephone service.

In 1998, with the burgeoning popularity of wireless and mobile cellular telephone service, the General Assembly created the Commercial Mobile Radio Service Emergency Telecommunications Board, now known as the CMRS Board.[1] The legislature also created the "CMRS fund."[2] To cover the costs associated with the extension of 911–emergency service to mobile telephone users, KRS 65.7629(3) directed the Board to collect a CMRS service charge of $0.70 per month per CMRS connection.[3] KRS 65.7629(3) also provided that "The CMRS service charge [ ] shall be collected in accordance with KRS 65.7635 beginning August 15, 1998."

A "CMRS provider" is an entity that provides mobile telephone service to a mobile phone user.[4] Each CMRS provider was designated by KRS 65.7635(1) as "a collection agent for the CMRS fund." KRS 65.7635(1) mandated that each CMRS provider:

> shall, as part of the provider's normal monthly billing process, collect the CMRS service charges levied upon CMRS connections under KRS 65.7629(3) from each CMRS connection to whom the billing provider provides CMRS. Each billing provider shall list the CMRS service charge as a separate entry on each bill which includes CMRS service charge.

KRS 65.7635(2) clarifies that mobile service providers have no obligation to take legal action against customers who fail to pay the service charge. Rather, the statute provides that actions against delinquent CMRS customers would be "initi-

1.  KRS 65.7623.

2.  KRS 65.7629.

3.  A "CMRS connection" is the telephone number for a mobile phone assigned to a mobile service customer. KRS 65.7621(6).

4.  KRS 65.7621(9).

ated by the state on behalf of the [CMRS] board[.]"

This statutory scheme for assessing and collecting the CMRS service charge was obviously designed and intended to integrate seamlessly into what was then the only mode of selling mobile telephone service to consumers: a CMRS service provider such as AT & T Mobility or Sprint entered into a fixed contract with a customer to provide mobile phone service for an extended period, typically two years. The customer was assigned a mobile telephone number (a "CMRS connection") and was billed each month at the contract rate. Adding the CMRS service charge of $0.70 per month as a separate item on each monthly bill was a simple, almost natural, way to collect the service charge.

It was against this statutory backdrop that Virgin began doing business in Kentucky as a CMRS provider in August 2002. Unlike the conventional providers of mobile telephone service, Virgin structured its service on a new business model, marketing its service to a customer base with different abilities and needs. Virgin recognized that some potential consumers of mobile telephone service, especially individuals with low incomes, did not have the credit to qualify for an extended contract with a conventional service provider, or had no fixed mailing address for receiving monthly bills; other potential customers included individuals who, for a variety of reasons, could not or would not commit to the conventional fixed-period billing contract. For all of those consumers, Virgin developed a pre-paid mobile telephone service, selling telephones with pre-paid phone service in retail outlets like Wal–Mart.

Purchasers of pre-paid mobile service received a mobile telephone with a CMRS connection, and a fixed quantity of wireless telephone service. Since pre-paid CMRS service was purchased at a retail outlet, consumers of the service did not deal directly with a CMRS provider, and thereafter had no relationship with a CMRS provider except for the occasional purchase of additional minutes of phone service. Significantly, users of pre-paid mobile telephones never received a monthly bill. Because their mobile phone service was paid for prior to using it, they never had an unpaid balance for prior phone service for which they could be billed. Under the prepaid-CMRS plan, collecting the CMRS service charge in a manner consistent with the mandate of KRS 65.7635(1) was not physically or conceptually possible because prepaid CMRS users and providers had no "normal monthly billing" cycle. At this point, it is necessary to note that in 2002, the General Assembly amended KRS 65.7629(3), to require the CMRS Board to collect the CMRS service charge from each "CMRS connection" with "a place of primary use, as defined in 4 U.S.C. sec. 124, within the Commonwealth." However, the 2002–amendment made no mention of pre-paid mobile service and it made no change whatsoever to the prescribed method of collecting the service charge set out in KRS 65.7635.

With no possible means to collect a CMRS service charge in the statutorily-prescribed method, Virgin made no attempt to collect the service charge from the CMRS connections that it had sold. Under the assumption that it was responsible for the collection of the service charges, Virgin instead estimated that its customer's would have owed $289.807.20 in service charges, and it then paid that amount from its own revenue to the CMRS Board. By 2005, however, based upon industry research, Virgin concluded that, like other states, Kentucky's statutory scheme for collecting the CMRS service charge through the regular monthly bill-

ings did not obligate providers of prepaid CMRS to act as a collection agent for the Board.[5] In May 2005, Virgin stopped estimating its customers' monthly service charges making payments to the Board from its own treasury. It then asked the CMRS Board to refund the $286,807.20 previously paid. The Board denied the requested refund, and took no action then against Virgin to compel Virgin to resume payment.

In 2006, Governor Fletcher publicly called upon the legislature to close the "tax loophole on prepaid cell phones" by amending the CMRS service charge statutes. As a result, the General Assembly amended KRS 65.7629(3), effective July 12, 2006. The 2006 amendments expressly stated that prepaid mobile phone service was subject to the CMRS service charge, and it prescribed alternate methods by which the service charge for prepaid CMRS service should be collected and remitted to the Board. It is not contested that after July 12, 2006, Virgin was required to collect the CMRS service charge from its customers using one of the methods prescribed by the amended law, and it has apparently done so.

Based upon its position that it had no duty to collect the CMRS service charge prior to July 12, 2006, Virgin regarded the $286,807.20 previously paid from its own funds as an erroneous overpayment. In October 2006, Virgin again asked the Board to refund the claimed overpayment. When the Board did not promptly respond, Virgin initiated a self-help method of recoupment: it began claiming credits for the "overpayment" by applying its post-July 2006 service charge collections to the claimed overpayment. In effect, Virgin made no CMRS payment to the Board for nearly two years after July 2006, until it had recaptured from post-July 2006 collections the $286,807.20 it had paid before May 2005. After recouping the $286,807.20, Virgin began remitting current CMRS collections to the Board as they became due.

In October 2008, the Board filed suit in the Jefferson Circuit Court to recover from Virgin "all monthly 911 services charges owed by Virgin Mobile for CMRS connections from 1999 through July, 2006." After both parties moved for summary judgment, in March 2010, the trial court concluded that even under the pre-July 2006 version of KRS 65.7629, Virgin was to collect the CMRS service charge. The circuit court entered summary judgment against Virgin for $547,945.67. That sum consisted of the $286,807.20 that Virgin had recouped from current collections, plus the additional $261,138.47 of service

---

5. The issue has now been litigated in several states, with results going both ways depending upon the specific wording of each state's statutes. Upon review of Texas's pre–2010 statutory scheme for financing wireless 911–service, which is substantially the same as Kentucky's pre–2006 scheme, the Supreme Court of Texas concluded, as we do today, that the act did not require providers of prepaid wireless service to collect the service fee. See *TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d 173 (Tex.2013). The Sixth Circuit Court of Appeals, in *Kentucky Commercial Mobile Radio Serv. Emergency Telecommunications Bd. v. TracFone Wireless, Inc.*, 712 F.3d 905, (6th Cir.2013), reached the opposite conclusion with respect to Kentucky law. However, the Sixth Circuit recognized that "Kentucky state law controls this action," and that it was "bound by the rulings of the state supreme court." With no ruling from this Court to provide guidance, the Sixth Circuit relied upon the very decision of our Court of Appeals that we now reverse as "the best predictive insight regarding the 1998 Act" that was then available. *Id.* at 912–13. Obviously, our reversal of that decision undermines the authoritative weight that we would have otherwise accorded to an opinion of the Sixth Circuit Court of Appeals.

charges that the Board claimed had accrued between May 2005, when Virgin ceased its voluntary payments, and July 2006, when the statutory amendments removed any doubt about Virgin's CMRS obligation to collect the service charges from its customers. The trial court also granted the Board's request for an award of attorneys' fees in the sum of $137,869.03, based upon the provision of KRS 65.7635(5) allowing the trial court to award to the prevailing party "reasonable costs and attorneys' fees" incurred in connection with an action to collect CMRS service charges.

Virgin appealed. The Court of Appeals affirmed the trial court's conclusion that as a "CMRS provider," Virgin had a statutory duty to collect the CMRS service charge from its customers during the pre-July 2006 time frame, and remit them to the Board, notwithstanding the statutory directive that the charge be collected though the provider's "normal monthly billing process." However, the Court of Appeals reversed the award of attorneys' fees upon its conclusion that Virgin "did, in fact, dispute payment of the service charge in good faith."

Upon discretionary review, based upon our traditional rules of statutory construction, we conclude that the applicable version of KRS 65.7635(1) did not require Virgin and other providers of pre-paid mobile phone service to collect the service charge owed by its customers prior to July 2006, and so we reverse the opinion of the Court of Appeals in that respect. We also reverse the Court of Appeals decision vacating the award of attorney's fees, but because our disposition of the issue of statutory construction alters the extent to which either party can claim to be the "prevailing party," we remand that issue to the Jefferson Circuit Court for further consideration.

## II. ANALYSIS

### A. The CMRS Service Charge Did Not Apply to Virgin Mobile Prior to the July 2006 Amendment.

On discretionary review before this Court, Virgin argues that the Court of Appeals erred by holding that the CMRS service charge applied to Virgin before the July 2006 statutory amendments. The issue presented involves only a matter of statutory construction, and so is purely a question of law which we review *de novo*. *See Saint Joseph Hosp. v. Frye*, 415 S.W.3d 631, 632 (Ky.2013).

We are, of course, guided by the customary rules of statutory construction, which first and foremost require us to ascertain and give effect to the intent of the General Assembly. "The cardinal rule of statutory construction is that the intention of the legislature should be ascertained and given effect." *MPM Financial Group, Inc. v. Morton*, 289 S.W.3d 193, 197 (Ky.2009). "This fundamental principle is underscored by the General Assembly itself in the following oft-quoted language of KRS 446.080(1): 'All statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature....'" *Jefferson County Board of Education v. Fell*, 391 S.W.3d 713, 718 (Ky.2012). "We also bear in mind that where the language of a statute is clear and unambiguous on its face, we are not free to construe it otherwise even though such construction might be more in keeping with the statute's apparent purpose." *MPM Financial Group*, 289 S.W.3d at 197.

Virgin contends that the pre-July 2006 version of KRS 65.7635(1) could not have been intended to require prepaid CMRS providers to collect the CMRS service charge because prepaid providers, by defi-

nition, have no "monthly billing process," do not send bills to CMRS users, and therefore could not be a "billing provider" covered by the statute. In response, the Board argues, based upon its reading of the entire pre-July 2006 version of the CMRS Act (KRS 65.7621—KRS 65.7643), that the legislature intended to assess the service charge upon users of prepaid CMRS service, as well as conventional fixed contract users, and that it intended for every CMRS provider, including prepaid providers, to collect the service fee and remit same to the CMRS fund.

■ Upon reviewing the statutory scheme as an integrated unit, and after harmonizing all of the separate parts into a symphonic whole, it is apparent first and foremost, that the General Assembly did not intend to impose the CMRS service charge upon the mobile phone service *providers;* rather, the CMRS Act clearly puts the burden of the CMRS service charge on the CMRS *user.* KRS 65.7635(1)[6] plainly directs the collection of the service charge "from [the CMRS provider's] customers." KRS 65.7629(3)[7] clearly directs the Board "to collect the CMRS service charge from each CMRS connection" and a "CMRS connection" is defined as "a mobile handset telephone number assigned to a mobile service customer." KRS 65.7621(6). Under the statutes, the CMRS provider is not required to *pay* the CMRS service charge, the provider is obligated to *collect* the service charge.

It is equally apparent that the legislature placed primary responsibility for the collection of the CMRS service charge on the CMRS Board, not the CMRS providers. Among the "powers and duties" assigned by KRS 65.7629 to the CMRS Board is the duty "[t]o collect the CMRS service charge from each CMRS connection." KRS 65.7629(3). Similarly, KRS 65.7635(2)[8] authorizes "the state" to initiate a suit against "any CMRS customer" to enforce the collection of the CMRS service charge, and it expressly relieves the CMRS providers of that obligation.

Moreover, within the statutory scheme for assessing and collecting the CMRS service charge, KRS 65.7635(1) provides that "[e]ach CMRS provider shall act as a collection agent for the CMRS fund[.]" The CMRS act does not leave the CMRS providers, as "collection agent[s]" for the fund, free to exercise their own discretion on how to collect the service charge and how much to collect. *Ford Motor Co. v. Kentucky Unemployment Compensation Commission,* 243 S.W.2d 657, 659 (Ky. 1951) ("The powers of an agent must be specific or necessarily inferred; they cannot be created carte blanche."); *see also* Restatement (Third) Of Agency § 2.01 (2006) ("An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accor-

---

6. KRS 65.7635(1) provides: "Each CMRS provider shall act as a collection agent for the CMRS fund. From its customers, the provider shall, as part of the provider's billing process, collect the CMRS service charges levied upon CMRS connections under KRS 65.7629(3) from each CMRS connection to whom the billing provider provides CMRS."

7. KRS 65.7629(3) provides: "The board shall administer the provisions of KRS 65.7621 to 65.7643, and shall have the following powers and duties: ... (3) To collect the CMRS ser-

vice charge from each CMRS connection...."

8. KRS 65.7635(2) provides: "A CMRS provider has no obligation to take any legal action to enforce the collection of the CMRS service charges for which any CMRS customer is billed. Collection actions to enforce the collection of the CMRS service charge against any CMRS customer may, however, be initiated by the state, on behalf of the board, in the Circuit Court of the county where the bill for CMRS service is regularly delivered...."

dance with the principal's manifestations to the agent, that the principal wishes the agent so to act.") In other words, as a collection agent for the CMRS fund, the CMRS provider is bound to the "principal's manifestations to the agent" on how to collect the fee. The applicable version of KRS 65.7629(3) mandated not only the amount of the service charge—"$0.70 per month;" it also manifested the means by which the service charge was to be collected: "The CMRS service charge [ ] shall be collected in accordance with KRS 65.7635 beginning August 15, 1998." KRS 65.7635, in turn directed that the service charge *shall* be included as a separate item on each monthly bill issued by a "billing provider" as part of its "normal monthly billing process." The pre-July 2006 version of the act permitted or authorized no other means of collecting the service charge.

The Board argues that the "normal monthly billing process" was simply an option, a *suggested* method that CMRS providers might use to collect from customers the monthly fee of $0.70. From that position, the Board argues that prepaid service providers like Virgin, who have no "normal monthly billing process," were supposed to devise some other means to locate the individual prepaid CMRS users and bill them for the service charge. On that point, we observe that the statute does not expressly provide the Board with the authority to depart from the mandated means of collecting the CMRS service charge, and the Board did not upon its own volition purport to adopt regulations giving its "collection agents" a substitute for the "normal monthly billing process."

Certainly Virgin could have developed some means to determine how many months each prepaid phone was available for use, and at the rate of "$0.70 per connection per month," estimate an amount "due" from each customer. And, it might further have devised a means to locate its customers and send bills. But just as we see nothing within the statutory framework that authorized the Board to deviate from the statutory command to collect the service charge "in accordance with KRS 65.7635," neither do we find anything that would authorize a prepaid CMRS provider to engage in such improvisation.

Finally, we cannot fail to note that KRS 65.7635(1) expressly commands that "each *billing* provider" shall include the service charge as an item on the customer's monthly bill. The Board suggests that the word "billing" in the phrase "billing provider" has no significance; that modifying the word "provider" with the adjective "billing" means nothing, and has no effect upon the duties prescribed by the statute. However, we cannot presume that the descriptive reference to "billing" providers is superfluous language. *University of Cumberlands v. Pennybacker,* 308 S.W.3d 668, 683–84 (Ky.2010) ("Simply put, we are not free to ignore portions of statutes that are inconvenient to a particular litigant's position.") Virgin is a "CMRS provider," but it clearly is not a "billing provider" because it sends no bills. Since all of the service it sold was paid for in advance, its customers never owed Virgin for CMRS service; because it had no monthly bills to send out to customers, Virgin had no "normal monthly billing process" and therefore cannot reasonably be deemed to be a "billing" provider.

■ In short, the Board argues, as the Court of Appeals decided, that we must give effect to the phrases within the CMRS Act that require CMRS providers to collect the service charge from their customers, while at the same time we must ignore the even-more explicit provisions that detail the means by which customers *shall* be required to pay the service fee. We are bound, however, to give all parts of the statutes equal effect so that no part of

the statute will become meaningless or ineffectual. *Lewis v. Jackson Energy Co-op. Corp.,* 189 S.W.3d 87, 92 (Ky.2005).

It is certainly reasonable to suppose that back in 1998, the General Assembly intended for all mobile telephone users to have 911–emergency service and to pay for that service by way of the CMRS service charge. But, just as the 1984 General Assembly did not anticipate the advent of wireless mobile telephone service when it enacted the special tax for local 911–emergency service, the 1998 General Assembly did not anticipate the advent of prepaid wireless service, and it failed to provide for that unforeseen development. We can say with certainty that the 2002 legislature made no provision for it when it amended some of the CMRS statutes.

When we must review a statute to determine the General Assembly's intent, "the primary rule is to ascertain the intention from the words employed in enacting the statute, rather than surmising what may have been intended but was not expressed." *Metzinger v. Kentucky Retirement Systems,* 299 S.W.3d 541, 546 (Ky.2009) (quoting *Kentucky Association of Chiropractors, Inc. v. Jefferson County Medical Society,* 549 S.W.2d 817, 821 (Ky. 1977)). "It is neither the duty nor the prerogative of the judiciary to breathe into the statute that which the Legislature has not put there." *Gateway Construction Co. v. Wallbaum,* 356 S.W.2d 247, 248–49 (Ky. 1962).

We can reasonably find in the pre–2006 CMRS statutes, an intent of the General Assembly that all users of wireless mobile (CMRS) telephone service must pay a service charge of $0.70 per month, but by the plain language of the law, the legislature manifested no intention to require all CMRS providers to collect the service charge. The statutes manifest only the intention that "billing providers," the CMRS providers that normally sent monthly bills to their customers, were required to collect the service charge. The General Assembly obviously had no specific intention to compel providers of prepaid mobile phones to collect the fee from their customers because legislators did not anticipate that there would be such a thing as *prepaid* mobile phone service. It is quite likely that they also did not anticipate that telephones would soon be sending written messages, photographs, and video recordings anywhere in the world.

The legislature could have spoken with regard to the collection of CMRS service charges in general terms broad enough to have enacted a statute flexible enough to accommodate even unforeseen technological or commercial developments. It could have expressed a broad intention that *every* CMRS service provider, not just "billing providers," had to adopt some means to collect the fee. It did not do so. We cannot ignore or wish away the presence of the specific words that the legislature did use.

The statutes discussed in this opinion are, or were, part of the law of Kentucky, duly enacted by the General Assembly and the only logical inference that can be drawn from them places no obligation upon Virgin, prior to the 2006 amendments to collect the service charge. Virgin was entitled to the entry of a summary judgment holding that it was not required to collect from its prepaid customers a CMRS service charge prior to July 12, 2006. Accordingly, we reverse the opinion of the Court of Appeals insofar as it holds to the contrary.

**B. Virgin Mobile was not Entitled to Recoup the Pre–2006 Overpayment by Deducting Money From its Post July–2006 Service Charge Collections.**

As previously noted, it is undisputed that after the statutory amendments that

went into effect in July 2006, Virgin was expressly obligated to collect the CMRS service charge from its prepaid service customers using one of the specific methodologies prescribed in the amended statutes. KRS 65.7635(1) provides these methodologies as follows:

For CMRS customers who purchase CMRS services on a prepaid basis, the CMRS service charge shall be determined according to one (1) of the following methodologies as elected by the CMRS provider:

(a) The CMRS provider shall collect, on a monthly basis, the CMRS service charge specified in KRS 65.7629(3) from each active customer whose account balance is equal to or greater than the amount of service charge; or

(b) The CMRS provider shall divide its total earned prepaid wireless telephone revenue received with respect to its prepaid customers in the Commonwealth within the monthly 911 emergency telephone service reporting period by fifty dollars ($50), multiply the quotient by the service charge amount, and pay the resulting amount to the board; or

(c) In the case of CMRS providers that do not have the ability to access or debit end user accounts, and do not have retail contact with the end-user or purchaser of prepaid wireless airtime, the CMRS service charge and collection methodology may be determined by administrative regulations promulgated by the board to collect the service charge from such end users.

Regardless of the method elected, the service provider is nonetheless required to "collect" the CMRS service charges. KRS 65.7635(1). Virgin elected to use the method prescribed by KRS 65.7635(1)(b), which does not require Virgin to actually make monthly collections, but instead implements the use of a formula based on

Virgin's revenue and its number of prepaid customers to represent the money that Virgin would otherwise be required to collect.

However, instead of remitting the collected money to the Board, Virgin kept it to offset what it then believed, and what we now agree, was money it unnecessarily paid between 2002 and May 2005. Given that Virgin has repaid itself by this means of self-help recoupment, the issue before the Court is not, as Virgin posits, whether it is entitled to a refund of money paid by mistake. Virgin now has that money so it is clearly not due a refund. The issue we address is whether Virgin was entitled to claim a credit for that money by withholding it from the post–2006 obligation that it did owe. We now conclude that Virgin was not entitled to withhold payment, and that consequently it has underpaid the post–2006 obligation by a sum equal to the self-claimed credit of $286,807.20.

Virgin first contends that it was entitled to a refund of past payments or a credit against future payments pursuant to the tax refund provisions of KRS 134.580. The Board claims that the CMRS service charge is not a tax and so KRS 134.580 is not applicable. Although both the trial court and Court of Appeals regarded the service charge as a tax, we need not resolve that controversy. KRS 134.580(2) provides an avenue of relief only "[w]hen money *has been paid into the State Treasury* in payment of any state taxes, except ad valorem taxes, whether payment was made voluntarily or involuntarily . . . where no tax was due." (emphasis added.)

■ The collected payments of the CMRS service charge, however, are not "money that has been paid into the State Treasury." Pursuant to KRS 65.7627, CMRS service charge collections are paid into the CMRS fund, "an insured, interest bearing account to be administered and

maintained by the CMRS Board." The same statute further provides that "[m]oneys in the CMRS fund shall not be the property of the Commonwealth and shall not be subject to appropriation by the General Assembly." The refund provision of KRS 134.580 does not apply because Virgin's contribution to the CMRS fund was not money paid into the State Treasury.

Virgin next contends that it is entitled to a refund under "common law principles," citing *City of Covington v. Powell*, 59 Ky. 226 (1859) for the following rule:

> It may now be regarded as well settled in this State that when money has been paid through a clear and palpable mistake of law or fact, essentially affecting the rights of the parties, which in law, honor, or conscience was not due and payable, and which ought not to be retained by the party to whom it was paid, it may be recoverd [sic] back.

■ We do not disagree with the venerable principle cited in *City of Covington* or in the other cases relied upon by Virgin. We find them inapplicable here because they all involve the right to a refund, which as noted above, is not the issue here. Virgin does not assert these principles in support of an action for a refund of money mistakenly paid between 2002 and May 2005. Instead, Virgin is asserting them as a justification for its underpayment of the CMRS obligations that came due after July 12, 2006. Had Virgin paid those obligations when due, and in a timely fashion filed an action for a refund of the funds it had mistakenly thought it owed, the cited principles and the equities they embody may have favored Virgin's position. But that is not the case before us.

As we said above in our analysis of the CMRS statutory scheme, the service charge is an assessment owed to the CMRS fund by CMRS *users*, not CMRS *providers*. Virgin was required to act as collection agent for the CMRS board and remit the necessary service charges to the CMRS fund after July 2006. *See* KRS 65.7635(1). Contrary to Virgin's assertions, it makes no difference that when Virgin did finally resume making payments to the CMRS fund, it elected to pay them from its own revenue rather than collecting the charges on a monthly basis from its customers. *See* KRS 65.7635(1)(b). No matter how payment was made, the owed service charge amounts are representative of the number of CMRS users. As such, Virgin's common law right to a refund of money does not create a justification for its failure to remit money for the service charges. Neither party has cited authority for that kind of self-help recoupment, nor are we aware of any.

Virgin had legal remedies for pursuing the recovery of the money that it had mistakenly paid from its own resources to the CMRS fund, but retaining its current CMRS collections instead of remitting them as the statute requires is not one of them. We therefore affirm the opinion of the Court of Appeals insofar as it affirmed the judgment of the Jefferson Circuit Court that Virgin was liable for the underpayment of post-July 2006 CMRS collections in the sum of $286.807.20.

## C. The Court of Appeals Improperly Reversed the Trial Court's Award of Attorneys' Fees.

Although the Court of Appeals agreed with the trial court that Virgin was statutorily required to collect and pay the CMRS service charges prior to July 2006, it nonetheless reversed the trial court's award of attorney's fees based upon its own finding that Virgin had acted upon a good faith belief that it was not required to collect a service charge from prepaid

CMRS customers. KRS 65.7635(5), before and after the 2006 amendments, allows the trial court to award attorney's fees to the "prevailing party" in an action brought against a CMRS provider to recover unpaid CMRS collections.

At this point, the outcome of the case is a mixed bag for both parties. Virgin has prevailed in the sense that it is now established that it did not owe the CMRS Board for any CMRS service charges prior to July 2006, and so it has successfully established that it does not owe the $261,138.47 that the Board claimed had accrued in unpaid service charge collections between May 2005 and July 2006. However, the Board has prevailed in its effort to collect the $286,807.20 that Virgin improperly withheld from its post-July 2006 CMRS collections.

■ Where an award of attorneys' fees is authorized by statute, as it is here, the matter is left to the sound discretion of the trial court, and it is reviewable on appeal only for abuse of discretion. *Sexton v. Sexton*, 125 S.W.3d 258, 272 (Ky.2004). We are satisfied that the trial court gave appropriate consideration to the "lodestar" factors identified in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), which we have previously designated as the approved means of determining a reasonable attorney fee award. *Hill v. Kentucky Lottery Corp.*, 327 S.W.3d 412, 429 (Ky.2010). The Court of Appeals was clearly in error to substitute its findings for those of the trial court.

■ However, as noted in *Hensley*, the extent of a party's success is a "crucial factor in determining the proper amount of an award of attorney's fees." 461 U.S. at 440, 103 S.Ct. 1933. Since this opinion alters significantly the "extent of success" that either party can now claim, we conclude that it is appropriate and necessary to remand the case to the Jefferson Circuit Court for its reconsideration of the award of attorneys' fees, pursuant to KRS 65.7635(5) and the other appropriate factors.

### III. CONCLUSION

For the reasons set forth above, we reverse the opinion of the Court of Appeals to the extent that it affirmed the judgment of the Jefferson Circuit Court awarding the CMRS Board the sum of $547,945.67; we reverse the opinion of the Court of Appeals insofar as it reversed the attorneys' fee award entered by the Jefferson Circuit Court. We affirm the Court of Appeals opinion to the extent that it affirmed the Jefferson Circuit Court's summary judgment for the CMRS Board in the sum of $286,807.20. Finally, we remand this matter to the Jefferson Circuit Court with directions to enter judgment consistent with this opinion on behalf of the CMRS Board in the sum of $286,807.20 and for its reconsideration of an award of attorneys' fees to the respective parties herein.

All sitting. All concur.

