## PUBLIC SAFETY

**PUBLIC ASSISTANCE – WHETHER RECIPIENTS OF FEDERALLY SUBSIDIZED CELLPHONE SERVICE ARE REQUIRED TO PAY 9-1-1 FEE**

December 5, 2014

*The Honorable James E. DeGrange, Sr.*
*The Senate of Maryland*

You have asked whether low-income individuals who receive a free cellphone and a monthly allotment of free minutes from a prepaid wireless company through the federal government's Lifeline program ("prepaid Lifeline participants") must pay the fees that fund Maryland's 9-1-1 system. There are two kinds of 9-1-1 fees. The first is a fee of up to $1.00 per month on "subscribers" of telephone service; service providers add this fee to their subscribers' monthly bills. *See* Md. Code Ann., Public Safety ("PS") §§ 1-310 (authorizing collection of 9-1-1 fee of $0.25 per month), 1-311 (authorizing counties to impose additional monthly fee of up to $0.75) (2011 Repl. Vol. & 2014 Supp.).[1] The second fee applies to prepaid wireless telephone service. *See* PS § 1-313. This 60-cent fee is imposed on every "retail transaction" for prepaid service and is collected by the "seller" from the "consumer" at the time of purchase. PS § 1-313. You have asked whether prepaid Lifeline participants must pay either fee.

In our opinion, prepaid Lifeline participants are not required to pay either fee under the law as it currently reads. Because we conclude that these particular Lifeline participants receive "prepaid wireless telecommunications service," the fee on "subscribers" imposed by PS § 1-310 does not apply. Instead, we must look to the fee that is imposed by PS § 1-313 on a "retail transaction" of "prepaid wireless communications service." The plain language of that section, however, provides no mechanism for collecting the fee from Lifeline participants, who do not participate directly in a "retail transaction." And while there is some indication that, at an abstract level, the Legislature intended everyone with access to the 9-1-1 system to pay the fees that support the system, we have found no evidence that the

---

[1] All citations to the Public Safety Article are to the 2011 Replacement Volume and 2014 Supplement unless otherwise noted.

Legislature specifically considered whether prepaid Lifeline participants should pay a 9-1-1 fee. Given the language of the statute and the lack of a clear collection mechanism, we cannot conclude that the General Assembly intended prepaid Lifeline participants who receive free cellphone service to pay a 9-1-1 fee.

The decision about whether these low-income individuals should pay the fee is a matter of public policy that we must leave to the Legislature. The General Assembly has twice before considered whether to amend the 9-1-1 fee regime to take account of emerging technologies and new business models in the telecommunications industry. We see this as another instance where the Legislature must decide whether the statute should be amended.

# I

## Background

### A. *Maryland's Two 9-1-1 Fees*

In 1979, the General Assembly established 9-1-1 as the primary emergency telephone number in the State and created the Emergency Number Systems Board[2] to oversee the installation of 9-1-1 systems in every county. 87 *Opinions of the Attorney General* 83, 85 (2002). In doing so, the Legislature also established a fee to fund the installation of the system and any necessary enhancements. 1979 Md. Laws, ch. 730 (codified as Md. Code. Ann., Art. 41, § 204H-5(b)).

Over the next few decades, this fee evolved into what is now the enhanced 9-1-1 (or "E 9-1-1") fee regime encompassed by sections 1-310 and 1-311 of the Public Safety Article.[3] These

---

[2] The Board is an entity within the Department of Public Safety and Correctional Services and is composed of 17 members appointed by the Governor with the advice and consent of the Senate. PS § 1-305(a), (b). The members include representatives from the telephone industry, State government, and local government as well as two members of the general public. PS § 1-305(b).

[3] Further information on the development of "enhanced" 9-1-1 systems can be found in 87 *Opinions of the Attorney General* 83. Because the distinction between the two systems is not important here, we use the terms "9-1-1 fees" and "E 9-1-1 fees" interchangeably throughout this opinion.

statutes impose a fee on "[e]ach subscriber to switch local exchange access service [*i.e.*, landline service] or CMRS [*i.e.*, "Commercial Mobile Radio Service" or, more simply, cellphone service] or other 9-1-1-accessible service." PS § 1-310(b); *see also* PS § 1-311(b). The fee is then "payable when the bill for the telephone service or CMRS or other 9-1-1-accessible service is due." PS § 1-310(c). In other words, the fee is added to every subscriber's monthly bill, and the service provider remits the funds to the Comptroller on behalf of the subscriber. PS §§ 1-310(d), (e), 1-311(f)–(h). The statewide fee is 25 cents per month, and counties may impose an additional 75 cents per month on top of the statewide fee for a total of $1.00 per month. PS §§ 1-310(c), 1-311(c)(1).

During the 1990s, however, a new business model emerged that did not fit easily within the State's method of collecting the fee through customers' monthly bills. Wireless carriers like TracFone began offering prepaid cellphone service, which allowed customers to buy a fixed allotment of minutes in advance without the need for annual contracts or monthly bills. *See TracFone Wireless*, *Inc. v. Comm'n on State Emergency Comm'cns*, 397 S.W.3d 173, 176 (Tex. 2012) (explaining the basics of prepaid wireless service). At first, many prepaid wireless companies remitted 9-1-1 fees to state governments, but they soon stopped, contending that they were not required to collect the fees because their customers did not receive bills for their service. *See*, *e.g.*, *id.* at 176-77. In some states, the issue was resolved through litigation, though with different outcomes. In Texas and Kentucky, for example, courts agreed that the fee did not apply to prepaid wireless service, *see id.* at 178, *Virgin Mobile U.S.A.*, *L.P. v. Kentucky*, __ S.W.3d __, 2014 WL 4116480 (Ky. Aug. 21, 2014), while in Alabama and Washington, courts held that the lack of an explicit collection mechanism did not excuse wireless providers from the statutory obligation to pay the fee. *See T-Mobile South*, *LLC v. Bonet*, 85 So.3d 963, 976-77 (Ala. 2011); *TracFone Wireless*, *Inc. v. Dep't of Revenue*, 242 P.3d 810, 818-19 (Wash. 2010).

In Maryland, the issue was resolved by legislation. In 2013, the General Assembly established a new 9-1-1 fee that explicitly applied to "prepaid wireless telecommunications service." 2013 Md. Laws, ch. 313 (codified as PS § 1-313). This statute imposes a 60-cent fee per "retail transaction," which is defined as the "purchase of prepaid wireless telecommunications service from a seller for any purpose other than resale." PS § 1-313(a)(4), (b). The fee is then "collected by the seller from the consumer for

each retail transaction in the State." PS § 1-313(c). In other words, the fee is levied at the point of sale, much like a sales tax. Every time a consumer purchases a prepaid cellphone or prepaid cellphone minutes from a seller, the seller collects a 60-cent fee on behalf of the State by adding it to the purchase price. The "fee is the liability of the consumer and not of the seller or of any provider," except that the seller must remit the fees it collects to the Comptroller. PS § 1-313(e), (g).

The two fee regimes are mutually exclusive. The new prepaid wireless E 9-1-1 fee governs only "prepaid wireless telecommunications service." PS § 1-313. Conversely, the older fee, which is levied on "[e]ach subscriber to switch local exchange access service or CMRS or other 9-1-1-accessible service," explicitly *excludes* "prepaid wireless telecommunications service" from its scope. PS §§ 1-310(a), 1-311(a). Many states have similar dual systems that impose different fees on prepaid wireless service and other 9-1-1-accessible service. Some of these states have explicitly exempted all Lifeline participants from paying either 9-1-1 fee. *See*, *e.g.*, Del. Code Ann. tit. 16, § 10103(a)(1); N.Y. County Law §§ 304, 334, 335; Ohio Rev. Code Ann. § 128.42(A)(2)(b). The Maryland statutes, however, contain no such express exemption.

## B.   *The Lifeline Program*

Lifeline is a federally-funded program administered by the FCC which, since 1985, has provided subsidized telephone service to qualifying low-income individuals. *See* Federal Communications Commission, Lifeline Program for Low-Income Consumers, http://www.fcc.gov/lifeline (last visited, Dec. 2, 2014). The purpose of the program is to ensure that low-income Americans can "connect to jobs, family, and emergency services." *Id.* Federal regulations thus specifically require that Lifeline service include access to the 9-1-1 system. 47 C.F.R. § 54.101(b).

Individuals qualify for Lifeline if their income is at or below 135% of the federal Poverty Guidelines or they participate in one of various public assistance programs, such as Medicaid, the Supplemental Nutrition Assistance Program, or Temporary Assistance to Needy Families. 47 C.F.R. § 54.409. States may also create broader eligibility criteria, 47 C.F.R. § 54.409(a)(3),

which Maryland has elected to do for landline subscribers.[4]  *See* Md. Code Ann., Public Utilities ("PU") § 8-201(a)(2).  But each household may only have one Lifeline-subsidized connection.  47 C.F.R. § 54.409(c).  Telephone companies, for their part, may offer Lifeline service within a state only if they have been deemed an "eligible telecommunications carrier" ("ETC") by that state's regulating body.[5]  47 C.F.R. §§ 54.201, 54.405.  The program is financed through the Universal Service Fund, which levies a charge on telecommunication providers, who, in turn, may pass it on to their customers.  47 C.F.R. §§ 54.706, 54.712.

The federal program typically works as follows: A telephone company will give an eligible participant a "reduced charge" or "discount" of $9.25 per month on his or her bill, and the federal government will reimburse the service provider for that discount.  *See* 47 C.F.R. §§ 54.401, 54.403(a)(1), 54.407.  Although providers that are authorized to impose an "End User Common Line Charge" are subject to slightly different rules, the cellphone providers at issue in this opinion must apply the entire $9.25 subsidy "to reduce the cost of any generally available residential service plan or package."  47 C.F.R. § 54.403(b)(1).

### C.    *Prepaid Wireless Providers, the Lifeline Program, and "Free" Cell Phones*

Because prepaid wireless customers pay up front, providers cannot give Lifeline participants a discount on their monthly bills, as the federal regulations contemplate.  Instead, these carriers give Lifeline customers a free cellphone and a monthly allotment of "free" minutes.  This monthly allotment of minutes is at least equal in retail value to the $9.25 per month subsidy provided by the federal government.  *See* Matt Richtel, *Providing Cellphones for the Poor*, N.Y. Times (June 15, 2009), *available at*

---

[4]  Maryland has also established an additional discount for eligible landline subscribers under State law.  *See* PU § 8-201(c).  This additional discount does not apply to wireless carriers, however, who are covered instead by the standard federal regulations.  *See* PU §§ 8-201(b) (providing that the State program applies only to "local telephone compan[ies]"), 1-101(*ll*)(2) (defining "telephone company" to exclude "a cellular telephone company").

[5]  In Maryland, the regulating body is the Public Service Commission.  A service provider can also petition the FCC for recognition as an ETC if the provider is "not subject to the jurisdiction of a State commission."  47 U.S.C. § 214(e)(6).

http://www.nytimes.com/2009/06/15/technology/15cell.html?_r=0.
The federal government then reimburses the provider $9.25 per month for the prepaid phone service.

You asked in particular about SafeLink Wireless, a subsidiary of TracFone, but other prepaid wireless companies also offer the same kind of "free" plans.[6] Indeed, TracFone and other wireless companies have become ETCs for the limited purpose of providing Lifeline in numerous states, including Maryland. *See*, *e.g.*, Letter Order of Maryland Public Serv. Comm'n (Aug. 19, 2009) (approving Petition of TracFone Wireless, Inc. for Designation as an Eligible Telecommunications Carrier in the State of Maryland for the Limited Purpose of Offering Lifeline Service to Qualified Households). The plan offered by SafeLink to Lifeline participants includes either 68, 125, or 250 minutes per month, depending on whether the participant wants free international calling, rollover minutes, or both. *See* SafeLink Wireless Website, Terms & Conditions. Customers may also purchase additional minutes to supplement their subsidized monthly allotment. *Id.*

Because it is not clear how these Lifeline customers fit into the point-of-sale fee regimes adopted in Maryland and other states, SafeLink's service model has again led to uncertainty about whether prepaid wireless providers must collect 9-1-1 fees. Most of the states that have considered the issue concluded that the fee does not apply to Lifeline participants who receive "free" prepaid service. *See*, *e.g.*, Letter from the Attorney General of Rhode Island to Speaker of the House Gordon D. Fox (Oct. 12, 2012); Op. Att'y Gen. S.C., 2011 WL 5304075, at *3-4 (Oct. 10, 2011); Op. Att'y Gen. Tenn. No. 09-87, 2009 WL 1430917, at *5-6 (May 18, 2009); Virginia Department of Taxation, Prepaid Wireless E-911 Fee, http://www.tax.virginia.gov/site.cfm?alias=PrepaidWirelessE-911 (last visited Aug. 4, 2014). Other states, however, specifically require Lifeline customers or other recipients of free phone service to pay their 9-1-1 fee.

---

[6] *See*, *e.g.*, SafeLink Wireless, https://www.safelinkwireless.com/Enrollment/Safelink/en/NewPublic/index.html (last visited Dec. 3, 2014) ("SafeLink Wireless Website"); Life Wireless, http://www.lifewireless.com/phones.php (last visited Dec. 2, 2014); Access Wireless, http://www.accesswireless.com/Lifeline (last visited Dec. 2, 2014).

The Alabama 9-1-1 Board, for example, recently issued regulations requiring all ETCs to collect a monthly fee from Lifeline participants, including those who receive a free phone.[7] *See* Ala. Admin. Code r. 585-X-4-.05.  Texas regulations also appear to require that sellers or providers remit a fee even if they provide free service.  *See* 34 Tex. Admin. Code § 3.1271(d)(4)(B) (applying fee to "prepaid wireless telecommunication service not sold at retail but used by a seller or other person in Texas," including, for example, free service provided by the wireless company to employees).  And Colorado entered into a settlement agreement with a number of prepaid wireless providers that allowed them to operate as ETCs if, among other things, they agreed to pay the 9-1-1 fee on behalf of their Lifeline customers. *See*, *e.g.*, Colorado Public Utilities Comm'n, Docket No. 13A-0150T, Stipulation & Settlement Agreement, at 12, ¶11E (July 3, 2013) (attached to Colorado Public Utilities Comm'n, Recommended Decision, *In the Matter of Telrite Corp.*, 2013 WL 4013300 (July 30, 2013)).  As we understand it, prepaid service providers in Maryland do not currently collect any 9-1-1 fee from their Lifeline customers.

## II

### Analysis

You have asked whether any of Maryland's 9-1-1 fees apply to prepaid Lifeline participants who receive a free allotment of monthly minutes from SafeLink Wireless or other prepaid wireless companies.  As always, the "cardinal rule" of statutory interpretation "is to ascertain and effectuate legislative intent." *Mayor and City Council of Baltimore v. Chase*, 360 Md. 121, 128 (2000).  Although we begin our analysis with "the plain language of the statute," *La Valle v. La Valle*, 432 Md. 343, 355 (2013), "the plain language rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body." *Pelican Nat'l Bank v. Provident Bank*, 381 Md. 327, 336 (2004) (internal quotation marks and citation omitted).  "[I]f the true legislative intent cannot readily be determined from the statutory language alone,"

---

[7] TracFone has filed a lawsuit challenging these regulations, and certain interest groups sent a letter to Alabama's Governor in July 2014 urging him to rescind the regulations.  Mike Cason, *Users of Free Government Cellphones to Start Paying State 911 Tax*, AL.com, http://www.al.com/news/index.ssf/2014/07/users_of_free_government_ cellp.html (last visited Dec. 2, 2014).

we must "look to other indicia of that intent, including . . . its legislative history, its general purpose, and the relative rationality and legal effect of various competing constructions [of the statute]." *Baltimore County v. RTKL Assocs.*, 380 Md. 670, 678 (2004).

### A. Which 9-1-1 Fee Statute Governs?

Before we address whether prepaid Lifeline participants must pay the 9-1-1 fee, we must first determine which of Maryland's two 9-1-1 fee regimes governs the situation here. SafeLink's service is either "prepaid wireless telecommunications service," in which case it must be analyzed under the new point-of-sale fee imposed by PS § 1-313, or it is not, in which case the fee may be assessed only if SafeLink's customers are "subscribers" within the meaning of the older 9-1-1 fee set forth in PS § 1-310. A cellphone service qualifies as "prepaid wireless telecommunications service" if it satisfies the following four elements: It must (1) be "a commercial mobile radio service" and it must also (2) "allow[] a consumer to dial 9-1-1 to access the 9-1-1 system;" (3) "be paid for in advance;" and (4) be "sold in predetermined units that decline with use in a known amount." PS § 1-301(r).

As an initial matter, SafeLink provides commercial mobile radio service through the Lifeline program. CMRS "means mobile telecommunications service that is: (1) provided for profit with the intent of receiving compensation or monetary gain; (2) an interconnected, two-way voice service; and (3) available to the public." PS § 1-301(d). SafeLink clearly satisfies the second and third criteria; it provides voice service to the public in the same way as other cellphone plans. Although one might question whether the service is "provided for profit," the prepaid wireless companies indeed turn a profit from the $9.25 per month federal reimbursement because that reimbursement covers the *retail price*, not the per-unit cost to the provider. *See* Richtel, *supra*.[8]

Turning back to the other three elements of "prepaid wireless telecommunication service," SafeLink easily satisfies

---

[8] A provider may earn more profit still if the Lifeline participant purchases additional minutes or becomes a loyal, paying customer when he is no longer eligible for the federal program. *See* Richtel, *supra*.

most of these as well.  It certainly allows a consumer to dial 9-1-1.  In fact, federal law *requires* Lifeline providers to ensure access to the 9-1-1 system.  *See* 47 C.F.R. § 54.101(b).  And the service is provided "in predetermined units that decline with use in a known amount."  But it is not as clear that the service is "paid for in advance" given that Lifeline participants do not pay anything to their providers before receiving their monthly allotment of minutes.  Although the federal government pays for the service, it technically does not do so "in advance" because it reimburses the provider.

We do not believe, however, that the General Assembly intended for the determination of which 9-1-1 fee should govern to hinge on the timing of federal reimbursement.  Common sense must guide us in the interpretation of statutes, *Marriott Emps. Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 445 (1997), and, from a common sense perspective, SafeLink offers prepaid service.  The customer signs up for a set number of minutes of phone service and, if he uses up all of the minutes before his next allotment, he cannot make another call unless he purchases more.  It seems to us that the Legislature, in defining "prepaid wireless telecommunications service," was trying to distinguish prepaid service from the traditional "post-paid" model of wireless service covered by PS § 1-310, where a consumer is billed at the end of the month based on usage during that month.  The phrase "paid for in advance," therefore, was probably meant only to distinguish prepaid service from more traditional subscription service.

Our conclusion is bolstered by the fact that SafeLink customers who purchase additional minutes on top of their subsidized monthly allotment unquestionably receive "prepaid wireless telecommunications service" that would be governed by PS § 1-313.  It seems unlikely that the General Assembly intended consumers to be governed by two different, mutually exclusive fee statutes for the same service.  We will therefore categorize SafeLink as a "prepaid wireless" provider and focus on PS § 1-313 to determine whether its customers are subject to a 9-1-1 fee.

## B.    The Plain Language of § 1-313 of the Public Safety Article

We begin our analysis of § 1-313 with the plain language of the statute.  The provision imposes "a prepaid wireless E 9-1-1 fee of 60 cents per retail transaction."  PS § 1-313(b).  "Retail transaction" is defined as "the purchase of prepaid wireless

communications service from a seller for any purpose other than resale." PS § 1-313(a)(4). The statute requires that the "amount of the [fee] shall be disclosed to the consumer *at the time of* the retail transaction," PS § 1-313(d) (emphasis added), and it provides an explicit collection mechanism: "[T]he fee shall be collected by the seller from the consumer for each retail transaction in the State." PS § 1-313(c). In sum, the statutory scheme apparently envisions that a consumer will buy his or her phone service from a retailer and that the fee will be added to the purchase price, collected by the retailer, and remitted to the Comptroller.

Just based on these few provisions, it seems unlikely that the General Assembly specifically intended the fee to apply to prepaid Lifeline participants. The way in which Lifeline participants receive their service is not something that most people would normally think of as a "retail transaction." SafeLink customers do not buy their phone service, and no obvious transaction occurs when the 60-cent fee can be charged to the customer. If the customer chooses to buy additional minutes, he certainly must pay the fee on those minutes. But requiring Lifeline participants who do not pay for their service to pay the 9-1-1 fee does not seem to fit very comfortably within the statutory language.

The statutory definition of "retail transaction"—at least on its face—seems to confirm our initial sense that there is no such transaction here. As noted above, the statutory definition of "retail transaction" depends on whether a consumer "purchases" wireless service from a "seller." *See* PS § 1-313(a)(4). "Purchase" is not defined by the statute, but it generally means to "acquire by the payment of money or its equivalent." Webster's Encyclopedic Unabridged Dictionary 1568 (1996). "Seller" *is* defined by statute, but the definition is not very helpful: a "person that sells prepaid wireless telecommunications service to another person." PS § 1-301(v). The dictionary definition is somewhat more helpful; it defines "sell" as "to transfer (goods) or render (services) for another in exchange for money." Webster's Encyclopedic Unabridged Dictionary 1739. Together, then, the terms "purchase" and "seller" imply that some exchange of "money or its equivalent" must take place between the buyer and seller during the transaction—something that does not happen between the provider and the Lifeline participant here.

On similar grounds, two other Attorneys General have concluded that providing free service to Lifeline participants does not qualify as a "retail transaction" because the participants are not "charged for" and do not "purchase" their phones or phone service. *See* Letter from the Attorney General of Rhode Island to Gordon D. Fox, *supra*; Op. Att'y Gen. S.C., 2011 WL 5304075, at *3-4. The Rhode Island Attorney General, for example, reasoned that, "[s]ince . . . the qualifying consumer receives the telephone and service free of charge, no 'purchase' takes place," and there is thus no "retail transaction upon or for which E-911 charges must be collected." Letter from the Attorney General of Rhode Island to Gordon D. Fox, *supra* (internal quotation marks omitted).

Although this plain reading has considerable merit, we are not sure that the meaning of the statute is so clear as to foreclose all further inquiry. *See Mayor & Council of Rockville v. Rylyns Enterprises, Inc.*, 372 Md. 514, 551-52 (2002) (noting that the "intrinsic meaning [of a statute] may be fairly clear, but its application to a particular object or circumstance may be uncertain" (internal quotations omitted)). The notion that SafeLink provides free service is, after all, a fiction. The service is not actually free; the federal government pays for it. In this way, the *government* arguably "purchases" the minutes from the provider every month on behalf of the Lifeline participant. If the federal government implemented Lifeline by giving eligible participants a $9.25 voucher every month, and the participant exchanged that voucher for prepaid minutes from TracFone, it seems likely that the exchange would qualify as a "retail transaction." It is not obvious why the same participant should be exempt from the fee merely because the federal government has chosen a different way to administer its program.

Moreover, if the Legislature had specifically intended to exempt these customers, it could have explicitly excluded Lifeline participants from the fee regime, as a number of other state legislatures have done. *See, e.g.*, Del. Code Ann. tit. 16, § 10103(a)(1); N.Y. County Law §§ 304, 334, 335; Ohio Rev. Code Ann. § 128.42(A)(2)(b). But it did not provide for such an explicit exemption. In light of this ambiguity in how the plain language should apply, we will turn to "other indicia of [the Legislature's] intent" to help us interpret the statute. *RTKL Assoc.*, 380 Md. at 678; *see also Rylyns Enterprises*, 372 Md. at 552.

## C. *Other Indicia of Legislative Intent*

Unfortunately, these other indicia of legislative intent also do not provide a definitive answer. The legislative history of PS § 1-313, for example, is not instructive. There is only one mention of Lifeline participants in the legislative record and no evidence whatsoever that the General Assembly considered this issue one way or the other.[9] To be sure, the 9-1-1 fee statute includes a declaration of purpose that, at first blush, appears to offer guidance: The General Assembly explicitly declared when enacting the prepaid wireless fee in 2013 that "*all* end user customers of 9-1-1-accessible services, including consumers of prepaid wireless communications service, should contribute in a fair and equitable manner to the 9-1-1 Trust Fund." PS § 1-302(a)(6) (emphasis added). This provision arguably reflects a legislative intent that everyone who has access to the 9-1-1 system should pay the fee that supports the system.

Although the principle makes sense in the abstract, we are not convinced that the Legislature, when it made this statement, was thinking about Lifeline participants who do not pay for their phone service. In 2013, the General Assembly was focused on *paying* customers who, at the time, were not required to contribute to the 9-1-1 Fund simply because they paid for their service in advance rather than receiving monthly bills. The Legislature did not have the opportunity to consider whether it would be "fair and equitable" to impose the same burden on low-income individuals who receive phone service at no cost through

---

[9] The only mention of Lifeline that we could find in the legislative history came from DPSCS's legislative affairs director, Kevin Loeb, during the hearings on Senate Bill 745, and it does not shed much light on the applicability of the 9-1-1 fee. Responding to concerns about the impact a prepaid wireless 9-1-1 fee could have on Maryland's low-income residents, Mr. Loeb explained that data showed that people of all incomes used prepaid phones and that, in any event, the poorest of the poor received federal subsidies through the Lifeline program. *See* 2013 Leg., Reg. Sess., Hearings on S.B. 745 Before the Senate Finance Comm. (Feb. 19, 2013) and the House Health and Gov't Operations Comm. (March 26, 2013) (testimony of Kevin Loeb). It is unclear whether Mr. Loeb meant that the Lifeline participants would not have to pay the fee or merely that the fee would not inflict a significant financial burden on Lifeline participants because they already received discounted service. In any event, there is no evidence of how the members of the General Assembly regarded his remarks.

a federal benefit program. Nor does the "everyone pays" principle have universal appeal. As the Tennessee Attorney General noted, it would "seem peculiar for persons who are supplied a free phone to be subjected to a monthly service charge." Op. Att'y Gen. Tenn. No. 09-87, 2009 WL 1430917, at *6.

The collection mechanism established by the General Assembly provides perhaps the best evidence that the Legislature did not have Lifeline participants in mind when creating the new prepaid wireless fee. The fee is supposed to be collected "by the seller from the consumer" for each "retail transaction." PS § 1-313(c)(1)(i). A person only qualifies as a "consumer" if he "purchases prepaid wireless telecommunications service in a retail transaction." PS § 1-313(a)(2). Even assuming that a "purchase" occurs when the federal government pays for Lifeline service, the Lifeline participant is not the one doing the purchasing and thus would seem not to qualify as a "consumer" from which the fee may be collected.

Moreover, even if a Lifeline participant were considered a "consumer," there would be no obvious way to collect the fee. The statute envisions that the seller will collect the fee from the consumer at the time of the retail transaction, but there is no direct financial transaction between the prepaid Lifeline participant and the service provider. If the General Assembly had specifically intended the fee to apply to these Lifeline participants, we suspect that it would have outlined a workable collection mechanism.[10]

---

[10] Although we have concluded that the prepaid wireless fee governs this situation, we note that a similar problem would arise if we analyzed SafeLink's service under PS §§ 1-310 and 1-311. This older fee regime, which applies to "subscriber[s] to . . . 911-accessible service," requires that the fee be paid "when the bill for . . . service is due" and mandates that the service carrier "add the 9-1-1 fee to all current bills rendered." PS § 1-310(b)–(d). Lifeline participants who receive free phone service may well be "subscriber[s]," but, even so, there is no clear collection mechanism. The fee must be paid when the bill is due, but SafeLink customers are not billed for their service. *See* Op. Att'y Gen. Tenn. No. 09-87, 2009 WL 1430917, at *5-6 (concluding that a similarly-worded statute did not require SafeLink customers to pay an E 9-1-1 fee). If the General Assembly were to consider legislation clarifying the applicability of the 9-1-1 fee to Lifeline participants, we would recommend that the legislation address both the prepaid and subscription services provided under the Lifeline program.

The Kentucky Supreme Court recently found that the absence of a mechanism for collecting 9-1-1 fees from certain paying customers was relevant in determining whether the legislature intended prepaid wireless service providers to collect 9-1-1 fees from those customers. *See Virgin Mobile*, 2014 WL 4116480 at *5-7 (explaining that the legislature could not have intended to require service providers to fashion their own collection mechanisms where the legislature created an explicit mechanism and, thereby, "permitted or authorized no other means of collecting the fee"); *see also TracFone Wireless*, 397 S.W.3d at 176-78 (reaching a similar conclusion under Texas law). We similarly think that the absence of a workable mechanism for collecting the fee from prepaid Lifeline participants weighs against requiring these individuals to pay the fee.

We recognize that the "difficulty in collecting the tax" is largely "due to TracFone's choice of business model." *Wash. Dep't of Revenue*, 242 P.3d at 818. If prepaid wireless companies implemented Lifeline in a different way, there might be no ambiguity in the statute as applied to Lifeline participants. Along these lines, some courts have held that the lack of a clear collection mechanism should not excuse prepaid wireless providers from collecting 9-1-1 fees from their paying customers. *Virgin Mobile USA*, *LP v. Arizona Dep't of Revenue*, 282 P.3d 1281, 1284 (Ariz. 2012); *Bonet*, 85 So.3d at 976-77; *TracFone Wireless*, 242 P.3d at 818-19.

In those cases, however, the plain language of the fee statutes in question explicitly covered *all* telephone users. In Alabama, for instance, the fee was imposed on each telephone "connection." *Bonet*, 85 So.3d at 973; *see also Arizona Dep't of Revenue*, 282 P.3d at 1284 (imposing fee on each "customer" who receives "telephone or telecommunication services"); *Wash. Dep't of Revenue*, 242 P.3d at 817 (imposing fee on "all radio access lines"). A prepaid cellphone is still a "telephone con-nection," telephone "service," or "radio access line" even if the statute does not provide a clear way to collect the fee from that particular telephone user. Thus, the only question in those cases was whether the lack of a collection mechanism—by itself—somehow excused the providers from collecting an otherwise applicable fee for every "telephone connection" or every "radio access line." Here, however, the plain language of PS § 1-313 does not clearly provide that the fee applies in the first place. We

find the analysis of the Kentucky Supreme Court to be more relevant in this context.[11]

In sum, it does not appear that the General Assembly specifically intended to exempt prepaid Lifeline participants from the new prepaid wireless 9-1-1 fee *or* specifically intended them to pay the fee. But, considered together, the statutory language and the absence of a specific collection mechanism lead us to conclude that the best reading of the statute is that it does not require Lifeline participants to pay the fee on their free minutes.[12]

We do not mean to suggest that there is no way in which SafeLink and other service providers could collect the fee from prepaid Lifeline participants. For example, in Alabama—which requires all Lifeline customers to pay a 9-1-1 fee—SafeLink has notified its Lifeline customers that they should send it a check for $1.75 every month to cover the fee, which SafeLink presumably then remits to the state. *See* SafeLink Wireless Website, Notice to Alabama SafeLink Customers, https://www.safelinkwireless.com/Enrollment/Safelink/en/Public/AL.html (last visited Dec. 3,

---

[11] *Washington Department of Revenue* is distinguishable in another way as well. In that case, the state statute specifically identified the 9-1-1 fee as an "excise tax," so the court applied the canon of statutory construction by which exemptions from taxation are construed narrowly in favor of the government. *See* 242 P.3d at 822; *see generally Comptroller v. Gannett Co.*, 356 Md. 699, 707-08 (1999) (describing the canon). Here, however, it seems unlikely that the "9-1-1 fee" constitutes a tax. *See Bonet*, 85 So.3d at 984-85 (concluding that Alabama 9-1-1 fee was not a tax); *see also W. Capital Associated Ltd. P'ship v. City of Annapolis*, 110 Md. App. 443, 450-51 (1996) (concluding that service charge applicable to people who use a government service is not a tax). And, even if we were to consider the fee a tax, there is a competing canon of construction by which the applicability of tax laws—as opposed to exemptions therefrom—is interpreted in favor of the taxpayer. *See Gannett Co.*, 356 Md. at 707-08. Given that the language of PS § 1-313 does not clearly provide that the fee applies here, we think that this second canon would probably control in the unlikely event a reviewing court were to consider the 9-1-1 fee a tax.

[12] We do not decide whether the same analysis would apply to a customer who receives free minutes as part of a promotion or any other means. Such promotions might include the functional equivalent of a retail transaction between the seller and buyer—an exchange of loyalty points, for example—and, in any event, would require an entirely separate inquiry into the Legislature's intent.

2014). Another way to collect the fee might be to require the provider to subtract 60 cents every month from the $9.25 federal subsidy, remit those 60 cents to the Comptroller, and deduct 60 cents worth of minutes from the Lifeline participant's phone.[13] But, even if there are ways to collect the fee, it is not for us to determine the most appropriate collection mechanism. That is a policy choice for the General Assembly to make once it has had the opportunity to decide whether Lifeline participants should pay the 9-1-1 fee in the first place.

The General Assembly has twice before made similar policy decisions about whether to adapt the 9-1-1 fee regime to emerging business models in the telecommunications industry. In 1995, for example, the Legislature reacted to the increasing popularity of cellphones by extending the fee to "subscribers to . . . wireless telephone service and other 9-1-1-accessible service." 1995 Md. Laws, ch. 158. Then, when prepaid service providers claimed that they did not need to collect the existing fee from their paying customers, the Legislature established the new prepaid wireless fee in PS § 1-313. Whether the statute should be amended to account for the Lifeline program is again a question for the General Assembly.

## III

### Conclusion

We conclude that, under current law, customers of SafeLink Wireless and similar prepaid wireless providers are not required to pay a 9-1-1 fee on the free allotment of minutes they receive

---

[13] We are not certain whether this approach would be consistent with federal regulations, which require the subsidy to be used "to reduce the cost of any generally available residential service plan or package" without any reference to state-imposed 9-1-1 fees. *See* 47 C.F.R. § 54.403(b)(1). It is not uncommon for federal benefit programs to prohibit the use of federal benefits to pay unrelated state-imposed charges. *See*, *e.g.*, 7 U.S.C. § 2013(a) (providing explicitly that states participating in the Supplemental Nutrition Assistance Program are prohibited from charging sales tax on purchases made with food stamps). But given that service providers *must* include access to the 9-1-1 system in order to qualify under the Lifeline program, 47 C.F.R. § 54.101(b), we suspect that the FCC would consider the 9-1-1 fee to be part of the "cost of [the] generally available" plan. Still, in the absence of federal guidance, we cannot say with confidence the FCC would permit the use of federal subsidies to pay the 9-1-1 fee.

through the Lifeline program. Although we see no evidence that the Legislature specifically considered whether Lifeline participants should pay the fee, both the terms of the statute and the lack of a specific collection mechanism suggest that the fee does not apply to them. The General Assembly may wish to consider amending the statute to clarify whether these individuals should pay the fee and, if so, how the fee should be collected.

> Douglas F. Gansler
> Attorney General of Maryland
>
> Patrick B. Hughes
> Assistant Attorney General

Adam D. Snyder
Chief Counsel, Opinions & Advice